IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LAYTHRON TILLIS and ETHEL TILLIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:07-cv-00078-WKW |
| | ) | |
| CECIL E. CAMERON, HERTZ CLAIMS | ) | |
| MANAGEMENT, and THE HERTZ | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS HERTZ CLAIM MANAGEMENT CORPORATION and THE HERTZ CORPORATION'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

COME NOW Hertz Claim Management Corporation (incorrectly named as "Hertz Claims Management" in the First Amended Complaint) and The Hertz Corporation, and submit this Motion to Dismiss, or, in the alternative, Motion for Summary Judgment:

## I.

### Factual and Procedural Background

Plaintiffs originally filed this suit in state court on April 1, 2004 against Cecil Cameron. See Exhibit "A" attached hereto. The Complaint alleges claims against Mr. Cameron for negligence and wantonness arising from an automobile accident which occurred on April 14, 2002. Id. Plaintiffs proceeded to attempt service of process on Mr. Cameron twice by certified mail. Cameron v. Tilllis, 952 So. 2d 352 (Ala. 2006).[1] Those service attempts proved unsuccessful. Id. Subsequently, Plaintiffs moved the state

---

[1]All cases cited herein are attached hereto.

court to serve the Defendant Cameron by publication. Id. The state court granted that motion and subsequently Plaintiffs obtained a default judgment against Mr. Cameron. Id.

Meanwhile, since at the time of the accident Mr. Cameron was driving a Hertz Corporation rental car, the claims adjusting agency for Hertz, Hertz Claim Management Corporation, retained an attorney to monitor the case against Mr. Cameron. 952 So. 2d at 352.   When the attorney discovered that the Plaintiffs were attempting to obtain a default judgment against Mr. Cameron that attorney made a special appearance at a hearing before the state trial court to argue against the entry of such a judgment. Id. at 353-354.  Specially, the attorney argued that service by publication was not permissible under the circumstances because under Alabama law, a plaintiff may not obtain service of process over a non-resident defendant unless there is proof of process evasion. Id. at 353-354. The state trial court, however, disagreed and entered a default judgment against Mr. Cameron. Id. at 354.  The attorney retained by Hertz Claim Management appealed that judgment and the Alabama Supreme Court reversed the same. Id. at 354-355.

Plaintiffs did not seek to serve Mr. Cameron after the Alabama Supreme Court's ruling.  Instead, Plaintiffs sought, via subpoena, to discover the entire claims file of Hertz Claim Management Corporation[2] and then filed an amended Complaint against Hertz Claim Management Corporation and The Hertz Corporation. See Exhibits "B" and "C" attached hereto.  The amended Complaint purportedly states claims for breach of contract and fraud.  Exhibit "C".  Specifically, Plaintiffs contend that they are third

---

[2]Hertz Claim Management Corporation retained separate counsel who moved to quash the subpoena for Hertz Claim Management's claims file. The state court initially denied that motion to quash but later set aside the order which denied the same. Shortly thereafter, the defendants removed this case to this Court.

beneficiaries to any insurance agreement which would indemnify Mr. Cameron by virtue of his renting a

Hertz rental car. Id. Plaintiffs contend that Hertz breached such an agreement because the insurance policy

covering Mr. Cameron provides insurance coverage for him and they should receive benefits as a result

thereof. Id. Also, Plaintiffs contend that the Hertz defendants somehow fraudulently represented that they

could not waive service of process as to Mr. Cameron and/or that they had some obligation to the Plaintiffs

to appear and defend this case for Mr. Cameron regardless of the fact that he was never served. Id.


## II.

## Standard of Review

Dismissal based on a Rule 12(b)(6) motion is appropriate when it appears beyond doubt that the

plaintiff can prove not set of facts supporting his or her claim for relief. Financial Sec. Assur. Inc. v.

Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007). Summary judgment is appropriate where the

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c). As shown above and below, under either standard,

these defendants are entitled to dismissal.


## III.

## Legal Discussion

Count Four of the Plaintiffs' First Amended Complaint alleges that they have a direct action against

these defendants because Mr. Cameron was covered under liability insurance policy/agreement. Exhibit

3

C. Alabama law precludes such direct actions unless and until liability has been established and a judgment is obtained against the insured. State Farm Mut. Auto. Ins. Co. v. Brown, 894 So.2d 643, 648 (Ala. 2004). Indemnity coverage for Mr. Cameron exists as to him only and the only way the Tillis' could state a claim is if they established that the indemnity coverage was intended for their direct, as opposed to incidental, benefit. Mills v. Welk, 470 So.2d 1226, 1228 (Ala. 1985). The Tillis have not and cannot produce any evidence to suggest that any insurance or other type of indemnity agreement in this case was intended to directly benefit them. To accept the Tillis' claims would mean that every person involved in an automobile accident with an insured would automatically have a direct action against not only that insured, but the insurance company as well, no matter that liability had not been established against the insured. That argument is contrary to Alabama law which provides that this case would first have to proceed to judgment against Mr. Cameron before the Tillis' have any cognizable claims against the Hertz defendants. Brown, 894 So.2d at 648. In this case, it is undisputed that this matter has not proceeded to judgment and, therefore, Plaintiffs fail to state a claim for which relief can be granted.

Second, there is no obligation of any insurance company, business or other entity who provides liability or indemnity coverage to another, to waive service of process on behalf of the person who is afforded such coverage. While the undersigned has failed to find any Alabama or Eleventh Circuit case directly on point, it is submitted that Olsen v. Dairyland Mut. Ins. Co., 248 F.Supp. 639, 644 (D.C.Mont. 1966), correctly summarizes the law that establishes that neither The Hertz Corporation nor Hertz Claim Management Corporation had a duty to waive service of process on Mr. Cameron. Certainly, the Alabama Supreme Court implicitly recognized such in this very case by indicating that the counsel hired by Hertz to defend Mr. Cameron did not act improperly in refusing to accept service on Mr. Cameron's

behalf. See Cameron v. Tillis, 952 So.2d 352, 353 (Ala. 2006). Therefore, while the Tillis' fraud claim is vague at best, assuming their claim is based on an alleged representation that the Hertz defendants could not waive service of process and otherwise defend Mr. Cameron, such claim fails as a matter of law.

## IV.

### Conclusion

Based on the foregoing, Hertz Claims Management Corporation and The Hertz Corporation request the Court to find that the Plaintiffs fail to state a claim as a matter of law. Alternatively, these Defendants request the Court to find that no genuine issue of material fact exists as to the Plaintiffs' claims against them and they are entitled to judgment as a matter of law.

/s/ R. Rainer Cotter, III
R. RAINER COTTER,III(COT010)
Attorney for Hertz Claim Management Corporation
and The Hertz Corporation

OF COUNSEL:

MARSH, COTTER & STEWART, LLP.
P.O. Box 310910
Enterprise, Alabama 36331
Ph. 334-347-2626
Fax 334-393-1396
email: rrc@enterpriselawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following attorneys of record by placing a copy of the same in the U.S. Mail, postage prepaid and properly addressed this 2nd day of January, 2008:

Thomas B. Albritton, Esq.
P.O. Box 880
Andalusia, Alabama 36420

David W. Henderson, Esq.
P.O. Box 116
Montgomery, Alabama 36101

/s/ R. Rainer Cotter, III
OF COUNSEL

Attorney's Copy

| State of Alabama Unified Judicial System | **SUMMONS** | Case Number |
|---|---|---|
| Form C-34    Rev 6/88 | - CIVIL - | CV. 2004- _49_ |

IN THE _____ CIRCUIT _____ COURT OF __ COFFEE (ELBA DIVISON)COUNTY

**Plaintiff** LAYTHRON TILLIS, an individual **v. Defendant** CECIL E. CAMERON
and ETHEL TILLIS, an individual

NOTICE TO CECIL E. CAMERON, 33A Magnolia Avenue, Ft. Walton Beach, Florida 325-

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF OR PLAINTIFF'S ATTORNEY Thomas B. Albritton _____ WHOSE ADDRESS IS ALBRITTONS, CLIFTON, ALVERSON, MOODY & BOWDEN, P.C., P. O. Box 880, Andalusia, AL.
36420
THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSON AUTHORIZED by the Alabama Rules of Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant.

☒ Service by certified mail of this summons is initiated upon the written request of __ Plaintiffs _____ pursuant to the Alabama Rules of Civil Procedure.

Date _____   _____   By: _____
Clerk/Register

☒ Certified Mail is hereby requested.

_Thomas B. Albn_
Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____ (Date)

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on _____
(Date)

APR 2004
FILED
J.M. Counts
Court Clerk
Coffee Co. AL

Date _____   Server's Signature _____

Address of Server _____   Type of Process Server _____

**EXHIBIT**
"A"

Attorney's
Copy

# IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
## ELBA DIVISION

LAYTHRON TILLIS, an individual          )
and ETHEL TILLIS, an individual,        )
                                         )
    PLAINTIFFS,      )
                                         )
VS.                                      )          CASE NO. _____
                                         )
CECIL E. CAMERON,                        )
                                         )
    DEFENDANT.       )

## COMPLAINT

### COUNT ONE--NEGLIGENCE

1.    On or about the 14th day of April, 2002, the Defendant negligently caused or allowed the motor vehicle he was driving to collide with that vehicle driven by the Plaintiff, on U.S. Highway 331.

2.    As a proximate result of the above-described actions, the Plaintiff, Laythron Tillis, was caused to suffer injuries and damages.

WHEREFORE, for the above reasons, the Plaintiff seeks compensatory damages to include, but not to be limited to, damages for mental anguish.

### COUNT TWO--WANTONNESS

3.    The Plaintiff incorporates by reference and realleges as if fully set out herein, all previous allegations.

4.    On or about the 14th day of April, 2002, the Defendant, with a conscious disregard for the rights and safety of the Plaintiff, Laythron Tillis, wantonly caused or allowed the motor vehicle he was driving to collide with that vehicle driven by the Plaintiff, on U.S. Highway 331.

5.    As a proximate result of the above-described actions, the Plaintiff, Laythron Tillis, was caused to suffer injuries and damages.

WHEREFORE, for the above reasons, the Plaintiff seeks compensatory damages to include, but not to be limited to, damages for mental anguish and for punitive damages.

## COUNT THREE—LOSS OF CONSORTIUM

6.    The Plaintiff incorporates by reference and realleges as if fully set out herein, all previous allegations.

7.    The Plaintiffs, Ethel Tillis and Laythron Tillis, are husband and wife. As a proximate result of the above-described actions of the Defendant, the Plaintiff, Ethel Tillis has been deprived of the comfort and services of her husband and has, therefore, been damaged.

WHEREFORE, for the above reasons, the Plaintiff, Ethel Tillis, seeks compensatory damages as allowed by law.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES IN THIS CAUSE.**

Thomas B. Albritton (ALB009)
Attorney for Plaintiffs

OF COUNSEL:
ALBRITTONS, CLIFTON, ALVERSON
MOODY & BOWDEN, P.C.
P.O. Box 880
Andalusia, AL 36420
(334)-222-3177
(334)-222-2696

Please serve the defendant via certified mail as follows:

Cecil E. Cameron
33A Magnolia Ave.
Ft. Walton Beach, Florida 32548

COPY

**IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA**
**ELBA DIVISION**

| | | |
|---|---|---|
| LAYTHRON TILLIS, an Individual<br>and ETHEL TILLIS, an Individual, | ) <br> ) <br> ) | |
| PLAINTIFFS, | ) <br> ) | CASE NO. 2004-49 |
| VS. | ) <br> ) | |
| CECIL E. CAMERON, | ) <br> ) | |
| DEFENDANT. | ) | |

**NOTICE OF INTENT TO SERVE SUBPOENA ON NON-PARTY**

Take notice that upon the expiration of fifteen (15) days from the date of service of this notice the Defendant will apply to the Clerk of this Court for issuance of the attached subpoena directed to Hertz Claim Management, who is not a party and whose address is 3400 Lakeside Drive, Suite 520, Miramar, Florida 33027, to produce the documents and things at the time and place specified in the subpoena.

_____

Thomas B. Albritton          ALB009
Attorney for Plaintiffs

OF COUNSEL:

ALBRITTONS, CLIFTON, ALVERSON,
MOODY & BOWDEN, P.C.
P. O. Box 880
Andalusia, Alabama 36420
334/222-3177

---

EXHIBIT

"B"

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by placing a copy of same in the United States mail, postage prepaid, addressed as follows on this, the _21st_ day of _August_ , 2006:

Mr. David W. Henderson
HILL, HILL, CARTER, FRANCO,
COLE & BLACK, P.C.
Post. Office Box 116
Montgomery, Alabama 36101-0116

_____
Of Counsel

## IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
## ELBA DIVISION

| | | |
|---|---|---|
| **LAYTHRON TILLIS, an Individual** | ) | |
| **and ETHEL TILLIS, an Individual,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | **CASE NO. 2004-49** |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **CECIL E. CAMERON,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

### CIVIL SUBPOENA FOR PRODUCTION
### OF DOCUMENTS UNDER RULES 34(C) AND 45

TO:     Hertz Claim Management
        Attn: Custodian of Records
        3400 Lakeside Drive, Suite 520
        Miramar, Florida 33027

You are hereby commanded, at the instance of the Plaintiffs within fifteen (15) days after service of this subpoena:

To produce and permit said party to inspect and to copy each of the following documents:

The complete claims file for Laythron Tillis' claim maintained by you or your office relating to the incident that occurred on April 14, 2002, involving Cecil F. Cameron.

Such production and inspection is to take place where the documents are regularly kept or at some other reasonable place designated by you. Please inform us if the reasonable copying cost will be over $25.00. **If you produce the records via return mail, please execute the enclosed certification of records, as well.**

Protection of Persons Subject to Subpoenas:

(1)   A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fees.

(2)   (A)  A person commanded to produce and inspection and copying of designated books, papers, documents, or tangible things or inspection of premises need not

appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection of and copying at any time before the time specified for compliance may serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  "Serve" as used herein, means mailing to the party or attorney. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

   (i)    fails to allow reasonable time for compliance;

   (ii)    requires a resident of this state who is not a party or an officer of a party to travel to a place more than one hundred (100) miles from the place where that person resides, is employed or regularly transacts business in person, or requires a non-resident of this state who is not a party or an officer of a party to travel to a place within the state more than one hundred (100) miles from the place of service or, where separate from the place of service, more than one hundred (100) miles from the place where that person is employed or regularly transacts business in person, except that, subject to the provisions of Clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

   (iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or
   (iv)    subjects a person to undue burden.

(B)  If a subpoena

   (i)    requires a disclosure of a trade secret or other confidential research, development, or commercial information, or

   (ii)    required disclosure of an un-retained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)    required a person who is not a party or an officer of a party to incur substantial expense to travel more than one hundred (100) miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued, shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**Duties in Responding to Subpoena:**

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

You are further advised that other parties to the action in which this subpoena has been issued have the right to be present at the time of such production or inspection.

**You have the option to deliver or mail legible copies of documents to the party causing the issuance of this subpoena, but you may condition such activity on your part upon the payment in advance by the party causing the issuance of this subpoena of the reasonable costs of the making of such copies.**

**For your information Alabama law restricts the charges for records as follows: Retrieval fee, $5.00; pages 1-25, $1.00 per page; pages 26 and over, $.50 per page.**

You have the right to object at any time prior to the date set forth in this subpoena for compliance. Should you choose to object, you should communicate such objection in writing to the party causing the issuance of this subpoena and stating, with respect to any item to which objection is made, your reasons for such objection.

This _21st_ day of _August_____, 2006.

Thomas B. Albritton                    ALB009
Attorney for Plaintiffs
109 Opp Avenue
P. O. Box 880
Andalusia, Alabama 36420

CIRCUIT CLERK

BY: _____

## RETURN ON SERVICE

   Received this subpoena on _____ and served it on

the within named _____ on the _____ day of _____,

2006.

_____
PROCESS SERVER

## CERTIFICATION OF CUSTODIAN

I, _____, hereby certify and affirm in writing that I am _____ of Hertz Claim Management, which is an insurance company organized and operated pursuant to or under the laws of Florida, located at 3400 Lakeside Drive, Suite 520, Miramar, Florida 33027, that I am custodian of these records and that the within copy of said records are an exact, full, true and correct copy of said records pertaining to the incident that occurred on April 14, 2002 involving Laythron Tillis and Cecil E. Cameron.

I further certify that these records were made in the regular course of the business of the above-described insurance company and it was the regular course of said insurance company to make such record at the time the records attached hereto were made; and that said records were made at the time of such acts, transactions, occurrences, or events therein referred to or occurred or arose or were made, or within a reasonable time thereafter.

All of which I hereby certify and affirm on this the _____ day of _____, 2006.

_____
Records Custodian

STATE OF _____    )
COUNTY OF _____       )

I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name is signed to the foregoing and who is known to me, acknowledged before me under oath on this day that after first being duly sworn and after being informed of the contents of this Certification, that the same is true. This person then executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this, the _____ day of _____, 2006.

_____
Notary Public

My commission expires:

_____

(NOTARIAL SEAL)



## IN THE CIRCUIT COURT OF COFFEE COUNTY, ALABAMA
### ELBA DIVISION

| | | |
|---|---|---|
| **LAYTHRON TILLIS, an individual** | ) | |
| **and ETHEL TILLIS, an individual,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **VS.** | ) | **CV-04-049** |
| | ) | |
| **CECIL E. CAMERON, an individual;** | ) | |
| **HERTZ CLAIMS MANAGEMENT, a** | ) | |
| **foreign corporation; THE HERTZ** | ) | |
| **CORPORATION, a foreign corporation,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

### FIRST AMENDED COMPLAINT

### COUNT ONE--NEGLIGENCE

1.     On or about the 14th day of April, 2002, the Defendant negligently caused or

allowed the motor vehicle he was driving to collide with that vehicle driven by the Plaintiff, on

U.S. Highway 331.

2.     As a proximate result of the above-described actions, the Plaintiff, Laythron Tillis,

was caused to suffer injuries and damages.

WHEREFORE, for the above reasons, the Plaintiff seeks compensatory damages to

include, but not to be limited to, damages for mental anguish.

### COUNT TWO–WANTONNESS

3.     The Plaintiff incorporates by reference and realleges as if fully set out herein, all

previous allegations.

4.     On or about the 14th day of April, 2002, the Defendant, with a conscious

disregard for the rights and safety of the Plaintiff, Laythron Tillis, wantonly caused or allowed the



EXHIBIT
"C"

motor vehicle he was driving to collide with that vehicle driven by the Plaintiff, on U.S. Highway 331.

5.      As a proximate result of the above-described actions, the Plaintiff, Laythron Tillis, was caused to suffer injuries and damages.

WHEREFORE, for the above reasons, the Plaintiff seeks compensatory damages to include, but not to be limited to, damages for mental anguish and for punitive damages.

## COUNT THREE–LOSS OF CONSORTIUM

6.      The Plaintiff incorporates by reference and realleges as if fully set out herein, all previous allegations.

7.      The Plaintiffs, Ethel Tillis and Laythron Tillis, are husband and wife. As a proximate result of the above-described actions of the Defendant, the Plaintiff, Ethel Tillis has been deprived of the comfort and services of her husband and has, therefore, been damaged.

WHEREFORE, for the above reasons, the Plaintiff, Ethel Tillis, seeks compensatory damages as allowed by law.

## COUNT FOUR–BREACH OF CONTRACT

8.      The Plaintiffs incorporate by reference and reallege as if fully set out herein, all previous allegations.

9.      The Plaintiffs and the Defendants Hertz Claims Management and The Hertz Corporation, (hereinafter referred to as "Hertz defendants") were at all times relevant hereto, parties to a contract which provided for the payment of benefits in the event Cecil Cameron was involved in a accident involving a motor vehicle entrusted to Mr. Cameron by the Hertz defendants.

10.      These Defendants have breached this contract in that they failed to tender the

benefits to the Plaintiffs to which they are entitled as beneficiaries of the contract, proximately causing them damage.

WHEREFORE, for the above reasons, the Plaintiffs demand judgment against these Defendants for compensatory damages as allowed by law.

**COUNT FIVE–FRAUD**

11.    The Plaintiffs incorporate by reference and reallege as if fully set out herein, all previous allegations.

12.    At all times relevant hereto, the Hertz Defendants have misrepresented directly, and through their agents, servants, and employees that they are unable to accept service of process on behalf of the Defendant Cecil Cameron, or that they are otherwise unable to fully represent Mr. Cameron's interests in this litigation.

13.    The above-described statement is false, and was made for the purpose of deceiving the Plaintiffs, proximately causing them damage.

WHEREFORE, for the above reasons, the Plaintiffs demand judgment against these Defendants for compensatory damages, and for punitive damages, as allowed by law.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES IN THIS CAUSE.**

Thomas B. Albritton (ALB009)
Attorney for Plaintiffs

OF COUNSEL:
ALBRITTONS, CLIFTON, ALVERSON
MOODY & BOWDEN, P.C.
P.O. Box 880
Andalusia, AL 36420
(334)-222-3177
(334)-222-2696

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by hand delivery in open court to the following on this, the _12th_ day of _January_, 2007:

Mr. David W. Henderson
HILL, HILL, CARTER, FRANCO,
COLE & BLACK, P.C.
Post Office Box 116
Montgomery, AL 36101-0116

Mr. Rainer Cotter
MARSH, COTTER, & STEWART
P.O. Box 310910
Enterprise, AL 36331

_____
Of Counsel

Please serve the defendant via certified mail as follows:

Hertz Claim Management Corporation
The Corporation Company
2000 Interstate Park Drive Ste 204
Montgomery, AL 36109

The Hertz Corporation
The Corporation Company
2000 Interstate Park Drive Ste 204
Montgomery, AL 36109

# APPENDIX

Westlaw.

952 So.2d 352                                              Page 1

952 So.2d 352
**(Cite as: 952 So.2d 352)**

℃
**Cameron** v. **Tillis**
Ala.,2006.

Supreme Court of Alabama.
Cecil E. **CAMERON**
v.
Laythron **TILLIS** and Ethel **Tillis**.
1040493.

Aug. 18, 2006.

**Background:** Plaintiff and wife brought action
against driver of rental car, seeking damages arising
out of motor vehicle collision in which car occupied
by plaintiff was rear-ended by defendant's car, and
alleging negligence, wantonness, and loss of
consortium. The Coffee Circuit Court, No.
CV-04-49,Robert W. Barr, J., granted plaintiffs'
motion for entry of default judgment, and denied
motion by attorney hired to represent defendant by
rental agency to set aside default judgment.
Defendant appealed.

**Holding:** The Supreme Court, Lyons, J., held that
service by publication was not sufficient to gain
personal jurisdiction over nonresident defendant
under former rule.

Reversed and remanded.
West Headnotes
**[1] Appeal and Error 30 ☞957(1)**

30 Appeal and Error
　　30XVI Review
　　　30XVI(H) Discretion of Lower Court
　　　　30k957 Opening Default
　　　　　30k957(1) k. In General. Most Cited
Cases
The standard of review in the case of an order
setting aside, or refusing to set aside, a default

judgment proceeds on the basis that the trial judge
has great discretion, and his judgment will not be
disturbed unless he has clearly exceeded such
discretion.

**[2] Judgment 228 ☞346**

228 Judgment
　　228IX Opening or Vacating
　　　228k346 k. Invalidity of Judgment in
General. Most Cited Cases
When the grant or denial of a request for relief from
a judgment turns on the validity of the judgment,
discretion has no place for operation; if the
judgment is void, it is to be set aside, and if it is
valid, it must stand.

**[3] Automobiles 48A ☞235**

48A Automobiles
　　48AV Injuries from Operation, or Use of
Highway
　　　48AV(B) Actions
　　　　48Ak235 k. Process. Most Cited Cases
Service of process by publication on defendant in
personal injury action arising out of motor vehicle
accident was not sufficient to gain personal
jurisdiction over nonresident defendant, under
former version of rule governing service by
publication; defendant's last known address was a
Florida address, trial court made no finding that
defendant was Alabama resident, and prior version
of the rule did not allow service by publication on
nonresidents. Rules Civ.Proc., Rules 4.3(c),
12(b)(4).

**\*352** Randall Morgan and David W. Henderson of
Hill, Hill, Carter, Franco, Cole & Black, P.C.,
Montgomery, for appellant.
Thomas B. Albritton of Albrittons, Clifton,
Alverson, Moody & Bowden, P.C., Andalusia, for
appellees.LYONS, Justice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

952 So.2d 352                                                                Page 2

952 So.2d 352
**(Cite as: 952 So.2d 352)**

### I. Facts and Procedural History

Laythron Tillis and his wife, Ethel Tillis, allege that, on or about April 14, 2002, Cecil E. Cameron, while driving a rental car he had leased from Hertz Corporation, rear-ended the vehicle occupied by Laythron, injuring him. As a result, the Tillises sued Cameron in the Coffee Circuit Court; Laythron alleged negligence and wantonness, and Ethel alleged loss of consortium.

The Tillises twice attempted to serve Cameron with the summons and complaint via certified mail at Cameron's last-known address in Ft. Walton Beach, Florida. Both attempts failed, and each return-receipt came back unclaimed. Subsequently, the Tillises filed a motion with the trial court for service by publication, which the trial court granted. The trial court ordered*353 that notice of the complaint be published once a week for four successive weeks in a newspaper published in Coffee County. Apparently, Hertz became aware of the litigation and, pursuant to its rental agreement with Cameron, retained an attorney to represent Cameron. Hertz denies having had any contact with Cameron since entering into the rental agreement, and the attorney Hertz retained to represent Cameron denies ever having any contact with Cameron. Both Hertz and the attorney it retained to represent Cameron deny knowledge of Cameron's current whereabouts.

The attorney Hertz retained to represent Cameron states that he discovered through "alacourt.com," an Internet database of court records, that service had been made by publication, and he thereafter made a limited appearance in the trial court for the purpose of challenging such service. The attorney filed a " motion in opposition to plaintiff's motion for service by publication and motion to quash service." In effect, the motion falls under Rule 12(b)(4), Ala. R. Civ. P., attacking the sufficiency of process by arguing that Cameron was not subject to service by publication under the terms of the version of Rule 4.3(c), Ala. R. Civ. P., in effect at the time service by publication was made and that, the attorney says, applies to this proceeding.

The Tillises opposed the motion and moved for an entry of default. At a hearing in the trial court, the attorney retained to represent Cameron refused to accept service of process on Cameron's behalf. After the hearing, the trial court entered a written order denying the attorney's motion to quash service and granting the Tillises' motion for the entry of a default judgment. Subsequently, the trial court entered a judgment by default against Cameron and assessed damages of $120,000 for Laythron and $20,000 for Ethel. Fourteen days later, the attorney retained to represent Cameron filed a motion requesting the trial court to set aside the default judgment under Rule 55(c), Ala. R. Civ. P.; to grant relief from the judgment under Rule 60(b), Ala. R. Civ. P.; or to alter, amend, or vacate the judgment under Rule 59(e), Ala. R. Civ. P. The attorney for Cameron argued in his motion that a nonresident defendant cannot be served by publication; that, in any event, before service may be made by publication, there must be evidence indicating that the defendant has avoided service; that default judgments are disfavored in the law; that the default judgment unduly prejudiced Cameron; and that the damages awarded were unsupported and excessive. The trial court denied the motion, and Cameron appealed.

### II. Standard of Review

[1][2] "The standard of review in the case of an order setting aside, or refusing to set aside, a default judgment proceeds on the basis that the trial judge has great discretion, and his judgment will not be disturbed unless he has clearly [exceeded] such discretion." *Roberts v. Wettlin,* 431 So.2d 524, 526 (Ala.1983). However, "[w]hen the grant or denial [of a request for relief from a judgment] turns on the validity of the judgment, discretion has no place for operation. If the judgment is void, it is to be set aside; if it is valid, it must stand." *Smith v. Clark,* 468 So.2d 138, 141 (Ala.1985).

### III. Analysis

[3] The attorney for Cameron argues that the trial court erred in refusing to set aside the default judgment or otherwise to grant Cameron relief from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

952 So.2d 352

952 So.2d 352
**(Cite as: 952 So.2d 352)**

that judgment because, according to Cameron's attorney, the judgment was void in that the trial court lacked personal jurisdiction over **\*354** Cameron. See, generally, *Clark*, 468 So.2d at 141 ( "A judgment is void only if the court rendering it lacked jurisdiction of the subject matter or of the parties, or if it acted in a manner inconsistent with due process."). According to Cameron's attorney, the trial court lacked personal jurisdiction over Cameron because he had not been properly served with the summons and complaint. See, generally, *Image Auto, Inc. v. Mike Kelley Enters., Inc.,* 823 So.2d 655, 657 (Ala.2001) ("It is settled law that failure to effect proper service under Rule 4, Ala. R. Civ. P., deprives the court of jurisdiction and renders a default judgment void.").

Cameron's attorney argues that Cameron was not properly served because the law provides that only Alabama residents may be served by publication. In *Wise v. Siegel,* 527 So.2d 1281, 1282 (Ala.1988), this Court stated:
"In *Braley v. Horton,* 432 So.2d 463 (Ala.1983), the court held that the question of whether the defendant was a resident or a non-resident of the state was determinative of whether service of process by publication was ever permissible. There the Court held that Rule 4.3(c)[, Ala. R. Civ. P.,] applied only to resident defendants or a corporation with one of its principal places of business within the state. That rule contains the following provision:
" '(c) Avoidance of Service. When a *resident* defendant avoids service and his present location or residence is unknown and the process server has endorsed the fact of failure of service and the reason therefor on the process and returned same to the clerk or where the return receipt shows a failure of service, the court may, on motion, order service to be made by publication....' (Emphasis added.)
"Rule 4.3(a)(2) provides that 'In no event shall an *in personam* judgment be entered on service by publication except as provided in subparagraph (c) of this rule.' "

Cameron's attorney argues that, because the Tillises did not show that Cameron was a resident of Alabama and because the trial court made no finding that Cameron was a resident of Alabama,

the above-quoted authority requires reversal of the trial court's order refusing to grant Cameron relief from the default judgment.

*Wise* was decided in 1998. An amendment to Rule 4.3, Ala. R. Civ. P., effective August 1, 2004, deleted the term "resident" from subsection (c) of Rule 4.3, which was quoted in *Wise* and *Braley.* The Committee Comments to Amendment to Rule 4.3 Effective August 1, 2004, state: "Under the Rule as amended, any defendant who is avoiding service is amenable to service by publication, even nonresident defendants." In the instant case, the trial court's order for service by publication was entered on July 12, 2004, before the amendment to Rule 4.3(c) took effect. Under Rule 4.3(d)(3), valid service by publication must be published for four consecutive weeks, and in the instant case, publication was made on July 22, July 29, August 5, and August 12. However, under our caselaw, service by publication on a nonresident defendant was invalid on July 22 and July 29. Therefore, service in this case has not been validly published for four consecutive weeks. Because Cameron was not properly served, the default judgment is void.

*IV. Conclusion*

Because the default judgment is void, Cameron was due relief from that judgment, and the trial court erred in denying that relief. We pretermit discussion of the other questions presented by the brief filed by Cameron's attorney dealing with **\*355** the sufficiency of the evidence of avoidance of service under the circumstances as they existed at the time of publication, because consideration of that issue presupposes the availability of Rule 4.3(c), Ala. R. Civ. P., as amended effective August 1, 2004.

REVERSED AND REMANDED.

NABERS, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
Ala.,2006.
Cameron v. Tillis
952 So.2d 352

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

500 F.3d 1276                                                                                                    Page 1

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

**H**
Financial Sec. Assur., Inc. v. Stephens, Inc.
C.A.11 (Ga.),2007.

United States Court of Appeals,Eleventh Circuit.
FINANCIAL SECURITY ASSURANCE, INC.,
Plaintiff-Appellant,
v.
STEPHENS, INC., Hayes, James & Associates,
Inc., Defendants-Appellees.
**No. 04-14894.**

Sept. 18, 2007.

**Background:** Insurer of defaulted municipal bonds which financed county's solid waste processing facility brought suit asserting federal securities fraud claim against underwriter of the bonds and state law claims for fraud and negligent misrepresentation against underwriter and firm which provided civil engineering services for facility. The United States District Court for the Northern District of Georgia, No. 00-03181-CV-JOF-1,J. Owen Forrester, J., dismissed federal securities claim, and granted summary judgment for defendants on state law claims. Insurer appealed. The Court of Appeals initially affirmed in part, reversed in part, and remanded.

**Holdings:** On grant of rehearing, the Court of Appeals held that:

(1) bond insurer, which became owner of the bonds upon default, did not "otherwise acquire" bonds so as to confer standing to assert securities fraud claims under Rule 10b-5 against underwriter;

(2) insurer did not justifiably rely on representations contained in documents prepared by civil engineering firm, precluding insurer's claims of fraud and negligent misrepresentation against firm based on those representations; and

(3) insurer did not reasonably rely on representations made by underwriter, precluding claims of fraud and negligent misrepresentation based on those representations.

Affirmed.

Opinion, 450 F.3d 1257, vacated.
West Headnotes
**[1] Federal Courts 170B ⟲776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk776 k. Trial De Novo. Most Cited Cases

**Federal Courts 170B ⟲794**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
       170Bk794 k. Pleadings. Most Cited Cases
Court of Appeals reviews *de novo* a district court's dismissal of a complaint for failure to state a claim upon which relief could be granted, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟲1773**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)3 Pleading, Defects In, in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                                          Page 2

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases
A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⟜673**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak673 k. Claim for Relief in General. Most Cited Cases

**Federal Civil Procedure 170A ⟜1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in General
                170Ak1772 k. Insufficiency in General. Most Cited Cases
The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low, but, while notice pleading may not require that the pleader allege a specific fact to cover every element or allege with precision each element of a claim, it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Securities Regulation 349B ⟜60.37**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.35 Persons Entitled to Sue or Recover
                    349Bk60.37 k. Buyers or Sellers. Most Cited Cases
Municipal bond insurer's assumption of risk in bond transaction did not provide it with standing to assert a securities fraud claim under Rule 10b-5 on theory that it satisfied the purchaser-seller standing requirement because it bore the risk that a purchaser would ordinarily bear. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ⟜60.37**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.35 Persons Entitled to Sue or Recover
                    349Bk60.37 k. Buyers or Sellers. Most Cited Cases
Municipal bond insurer did not have standing as guarantor of the bonds to assert a securities fraud claim under Rule 10b-5 on theory that a guarantor qualifies as a purchaser of securities. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⟜60.37**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.35 Persons Entitled to Sue or Recover
                    349Bk60.37 k. Buyers or Sellers. Most Cited Cases
Municipal bond insurer did not have standing to assert a securities fraud claim under Rule 10b-5 on theory that, in insuring the bonds, it sold a security, i.e., a guaranty, since a guaranty does not qualify as a "security" for Rule 10b-5 purposes. Securities Exchange Act of 1934, §§ 3(a)(10), 10(b), 15 U.S.C.A. §§ 78c(a)(10), 78j(b); 17 C.F.R. § 240.10b-5.

**[7] Federal Civil Procedure 170A ⟜1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

170AXI(B)5 Proceedings
   170Ak1827 Determination
     170Ak1832 k. Matters Considered
in General. Most Cited Cases
Ordinarily, anything beyond the face of the
complaint and documents attached thereto is not
considered when analyzing a motion to dismiss;
however, exception exists in cases in which a
plaintiff refers to a document in its complaint, the
document is central to its claim, its contents are not
in dispute, and the defendant attaches the document
to its motion to dismiss.

**[8] Federal Civil Procedure 170A ☞1832**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
       170Ak1827 Determination
        170Ak1832 k. Matters Considered
in General. Most Cited Cases
Bond insurance policy would be considered by
Court of Appeals in analyzing motion to dismiss
securities fraud claim asserted by municipal bond
insurer, even though insurer did not attach policy to
its complaint or quote relevant terms of policy in its
complaint, where defendant attached policy to its
motion to dismiss, defendant did not lack notice that
district court or Court of Appeals might consider
the document, and document was central to insurer's
claim.

**[9] Securities Regulation 349B ☞5.13**

349B Securities Regulation
   349BI Federal Regulation
     349BI(A) In General
      349Bk5 Securities, What Are
       349Bk5.13 k. Bills and Notes;

Commercial Paper, Mortgages and Bonds. Most
Cited Cases

**Securities Regulation 349B ☞60.37**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.35 Persons Entitled to Sue or
Recover
        349Bk60.37 k. Buyers or Sellers.
Most Cited Cases
Municipal bond insurer did not otherwise acquire a
security, as would confer standing upon insurer to
assert a securities fraud claim against bond
underwriter under Rule 10b-5, although policy
provided that insurer would acquire bonds upon
default by municipal operator of solid waste facility
financed by bonds, where, at the time of such
transfer, the instruments that the insurer acquired
were no longer "securities," since insurer acquired
no right to receive interest or principal in the bonds
after disbursement, nor did it have right to future
payments. Securities Exchange Act of 1934, §§
3(a)(1, 13), 10(b), 15 U.S.C.A. §§ 78c(a)(1, 13),
78j(b); 17 C.F.R. § 240.10b-5.

**[10] Securities Regulation 349B ☞5.10**

349B Securities Regulation
   349BI Federal Regulation
     349BI(A) In General
      349Bk5 Securities, What Are
       349Bk5.10 k. In General; Investment
Contracts. Most Cited Cases
An instrument is an "investment contract," and thus
a security that is protected under Securities
Exchange Act's anti-fraud provisions, if it involves
an investment of money in a common enterprise
with profits to come solely from the efforts of
others. Securities Exchange Act of 1934, § 10(b),
15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[11] Securities Regulation 349B ☞5.25(1)**

349B Securities Regulation
   349BI Federal Regulation
     349BI(A) In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

349Bk5 Securities, What Are
    349Bk5.25 Corporate Shares or Stock
        349Bk5.25(1) k. In General. Most
Cited Cases
The characteristics typically associated with "stock," which is protected as a security under Securities Exchange Act's anti-fraud provisions, are that it grants the right to receive dividends contingent upon an apportionment of profits; is negotiable; grants the ability to be pledged or hypothecated; confers voting rights in proportion to the number of shares owned; and has the capacity to appreciate in value. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[12] Securities Regulation 349B ☞5.13**

349B Securities Regulation
    349BI Federal Regulation
        349BI(A) In General
            349Bk5 Securities, What Are
                349Bk5.13 k. Bills and Notes;
Commercial Paper, Mortgages and Bonds. Most Cited Cases
The factors to consider when determining if an instrument is a "note," and thus a security that is protected under Securities Exchange Act's anti-fraud provisions, are whether the buyer is interested primarily in the profit the note is expected to generate, it is an instrument in which there is common trading for speculation or investment, the investing public reasonably expects the instrument to be a note, and no other regulatory scheme significantly reduces the risk of the instrument. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[13] Subrogation 366 ☞1**

366 Subrogation
    366k1 k. Nature and Theory of Right. Most Cited Cases
"Subrogation" is the substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.

**[14] Subrogation 366 ☞1**

366 Subrogation
    366k1 k. Nature and Theory of Right. Most Cited Cases

**Subrogation 366 ☞27**

366 Subrogation
    366k27 k. Agreements for Subrogation. Most Cited Cases
Subrogation is either legal or conventional: "legal subrogation" is an equitable doctrine and arises by operation of the law without any agreement to that effect between the parties; "conventional subrogation" rests on contract, arising where an agreement is made that the person paying the debt shall be subrogated to the rights and remedies of the original creditor.

**[15] Securities Regulation 349B ☞60.36**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.35 Persons Entitled to Sue or Recover
                349Bk60.36 k. In General; Privity. Most Cited Cases
Insurer of defaulted municipal bonds lacked standing, as subrogee, to bring securities fraud claims against bond underwriter, absent any allegation of harm to bondholders, as opposed to allegation of harm to insurer itself, as required by Georgia law. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[16] Fraud 184 ☞3**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k2 Elements of Actual Fraud
            184k3 k. In General. Most Cited Cases
Under Georgia law, a plaintiff alleging fraud must demonstrate: (1) a false representation by the defendant, (2) the defendant's knowledge that the information is false (scienter), (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance by the plaintiff, and (5)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                              Page 5

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

damage to the plaintiff.

**[17] Fraud 184 ☞13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly
Made; Negligent Misrepresentation. Most Cited
Cases
To prove negligent misrepresentation under
Georgia law, a plaintiff must establish: (1) the
defendant's negligent supply of false information to
foreseeable persons, known or unknown; (2) such
persons' reasonable reliance upon that false
information; and (3) economic injury proximately
resulting from such reliance.

**[18] Fraud 184 ☞22(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k19 Reliance on Representations and
Inducement to Act
            184k22 Duty to Investigate
                184k22(1) k. In General. Most Cited
Cases
To establish reasonable reliance under Georgia law
as to either fraud or negligent misrepresentation, a
plaintiff must show that it exercised due diligence.

**[19] Fraud 184 ☞64(5)**

184 Fraud
    184II Actions
        184II(F) Trial
            184k64 Questions for Jury
                184k64(5) k. Reliance on
Representations and Inducement to Act. Most Cited
Cases
Although questions of due diligence, which a
plaintiff must show it exercised in order to establish
reasonable reliance in an action for fraud or
negligent misrepresentation under Georgia law, are
generally for the jury to decide, a court can find that
a party has failed to exercise due diligence as a

matter of law where due diligence failures are
particularly egregious.

**[20] Fraud 184 ☞20**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k19 Reliance on Representations and
Inducement to Act
            184k20 k. In General. Most Cited Cases

**Fraud 184 ☞22(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k19 Reliance on Representations and
Inducement to Act
            184k22 Duty to Investigate
                184k22(1) k. In General. Most Cited
Cases
Under Georgia law, insurer of defaulted municipal
bonds which financed county solid waste facility
failed to establish that it justifiably relied on
representations contained in budget certification
letter (BCL) and acceptance test contained in
request for proposals (RFP) prepared by civil
engineering firm, precluding insurer's claims of
fraud and negligent misrepresentation against firm
based on those representations; there was no
evidence that any of insurer's employees actually
read the BCL, and insurer did not ask firm any
questions regarding acceptance test or even inquire
as to whether facility passed the test.

**[21] Fraud 184 ☞22(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k19 Reliance on Representations and
Inducement to Act
            184k22 Duty to Investigate
                184k22(1) k. In General. Most Cited
Cases
Under Georgia law, insurer of defaulted municipal
bonds which financed county solid waste facility
failed to establish that it reasonably relied on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276

Page 6

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

representations made by underwriter of bond financing, precluding claims of fraud and negligent misrepresentation based on those representations, due to insurer's abject failure to satisfy its due diligence burden; insurer failed to seek any information regarding facility's performance in months leading up to bond closing and failed to make any inquiry regarding waste hauler who contracted with facility.

\*1280 Julie Ann Lierly, William H. Boice, Stephen E. Hudson, Kilpatrick Stockton, LLP, Atlanta, GA, Peter N. Wang, Friedman, Wang & Bleiberg, P.C., New York City, Kimberly J. Shur, Foley & Lardner, LLP, Washington, DC, for Plaintiff-Appellant.
Stacey Godfrey Evans, Thomas S. Richey, Powell Goldstein, LLP, Patrick Michael Phillips, John W. Greenfield, Greenfield, Bost & Kliros, P.C., Atlanta, GA, for Defendants-Appellees.
H. Peter Haveles, Jr., Arnold & Porter, LLP, John M. Vassos, John D. Gordan, III, Jeffrey D. Brooks, Morgan, Lewis & Bockius, LLP, New York City, for Amici Curiae.

Appeal from the United States District Court for the Northern District of Georgia.
*ON PETITION FOR REHEARING*

Before TJOFLAT and KRAVITCH, Circuit Judges, and LAWSON,[FN*] District Judge.

> FN* Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia, sitting by designation.

PER CURIAM:
Stephens, Inc.'s ("Stephens") petition for panel rehearing is GRANTED. We VACATE our prior opinion in this case, 450 F.3d 1257 (11th Cir.2006), and substitute the following in its place.

*I.*

The plaintiff, Financial Security Assurance, Inc. (" FSA"), appeals the district court's orders dismissing its Rule 10b-5 claim and granting summary judgment in favor of defendants Stephens and

Hayes, James & Associates, Inc. ("Hayes James") on its claims for common law fraud and negligent misrepresentation. The primary issue presented in this case is whether an insurer of municipal bonds that becomes the owner of those bonds upon default has standing pursuant to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. We conclude that, under the facts of this case, they do not. After thorough review, we affirm the district court's dismissal of the Rule 10b-5 claim and grant of summary judgment on the fraud and negligent misrepresentation claims.

*II. Facts*

In the early 1990s, Crisp County, Georgia approved plans for a regional solid waste processing facility (the "Facility"), which would extend the life of a newly-opened landfill by removing recyclable material from waste before dumping the remainder into the landfill. The County established the Solid Waste Management Authority of Crisp County (the "Authority") to construct and operate the Facility. To finance its initial construction, the Authority \*1281 obtained approximately $53 million in short-term bank loans in 1996 (the "Bank Financing ").

Once constructed, the Authority would obtain revenue for the Facility by accepting waste from cities, counties and private companies and by selling materials of value ("MOV") from the waste it collected. Accordingly, before the Facility was built, the Authority contracted with more than thirty of these entities (the "Participants"), each of which agreed to make minimum payments to the Authority based on the expected tonnage of waste the Authority would collect or the number of households the Authority would service in the city or county. They executed "put or pay" contracts. The Authority also contracted with TransWaste Services LLC ("TransWaste"), a waste hauler, to pick up the Participants' waste and deliver it to the Facility, paying a tipping fee for each ton delivered. TransWaste agreed to deliver enough waste to the Authority to break even. In turn, the Authority

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                     Page 7

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

agreed that TransWaste would receive a rebate from the Authority's revenues from the sale of recyclable MOV.

The Authority contracted with defendant Hayes James for civil engineering services, including the conduct of a feasibility study based on the Bank Financing and the preparation of a report on the results of an Acceptance Test that Hayes James had developed for the Facility's equipment.

The Authority hired Stephens to act as underwriter for a bond financing for the Facility. In early 1998, Stephens prepared a Request for Proposal ("RFP") for potential credit enhancers, including FSA. The RFP included a pro forma financial representation (the "Pro Forma"). The RFP's disclaimer instructed potential credit enhancers to perform their own due diligence.

FSA assigned one of its employees, Margaret Gifford, to analyze the RFP and make a recommendation as to whether FSA should insure the bonds. Gifford toured the Facility and obtained information about the equipment, the quantities of waste delivered and processed, and the amount of MOV recovered. She recommended that FSA insure the bonds. Gifford's report noted that the Authority's contracts were the ultimate security for the bond issue. She reviewed only one sample contract between the Authority and a Participant, however, and she did not request copies of the contracts with TransWaste or with Crisp County. Gifford testified in her deposition that she did not perform any due diligence after July 28, 1998.

FSA submitted a bid in late July 1998, which was later accepted. The bid was conditioned on full review of all legal documentation pertaining to the deal.

The RFP indicated that the Facility would be subjected to an Acceptance Test to ensure that the Facility met its design specifications. Hayes James supplied the Acceptance Test's design specifications for inclusion in the RFP, based on the original contract created in connection with the Bank Financing. Hayes James made a few minor changes to these specifications and then provided

them to Stephens for inclusion in the RFP. The Acceptance Test was administered after FSA agreed to insure the bonds. FSA never requested a copy of the test results, nor did it inquire as to how the Facility performed.

After Stephens accepted FSA's bid, Stephens's counsel prepared a Preliminary Official Statement (the "POS") for the Authority. Though her duties were officially finished by that point, Gifford testified that she did "glance at" the POS when it was provided to FSA. Ron Millet, in-house counsel for FSA, also testified that he read **\*1282** and made suggestions regarding at least one draft of the POS.

In October 1998, at the request of TransWaste, the Authority and TransWaste executed an amendment to their contract. The amendment extended the period for which TransWaste was eligible for its rebate based on MOV receipts and delayed enforcement of the break-even guarantee requirement. Stephens did not notify FSA of this amendment or the conversations that led to it. Also in October, Stephens, Hayes James, and the Authority prepared a first-year budget for the Authority, which was sent to FSA. Hayes James also provided a budget certification letter (the "BCL"), certifying that the budget was reasonable.

The bond transaction closed on November 12, 1998 (the "Bond Closing"). The final version of the Official Statement (the "OS") was delivered to FSA just prior to the closing. Within two months of the Bond Closing, the Authority informed FSA that it was revising its budget and cash flow analysis. FSA terminated Gifford's employment shortly thereafter, based in part on her performance in this transaction. The Authority and TransWaste then further amended their contract by reducing the tipping fee and relieving TransWaste of its tonnage guarantee. Eventually, the Authority exhausted its debt service reserve fund and was unable to continue making payments on the bonds.

In anticipation of litigation, the parties to this action entered into a tolling agreement on March 29, 2000. On December 1, 2000, FSA brought the present action in the United States District Court for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                                    Page 8

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

Northern District of Georgia, alleging federal securities fraud under Rule 10b-5 against Stephens and state law claims for fraud and negligent misrepresentation against both Stephens and Hayes James. The district court later granted Stephens's Rule 12(b)(6) motion to dismiss the federal securities claim. After a period of discovery, the defendants moved for summary judgment on the state law claims, which the district court granted, based primarily on FSA's failure to meet the due diligence requirements for justifiable reliance under Georgia law. FSA then filed the instant appeal.

### III. Discussion

### A. 10b-5 Standing

The district court dismissed FSA's Rule 10b-5 claim on the ground that FSA was not a purchaser or seller of securities as required by the Rule's authorizing statute, § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and thus lacked standing to bring the claim.

[1][2][3] We review *de novo* a district court's dismissal of a complaint for failure to state a claim upon which relief could be granted, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Roberts v. Florida Power & Light Co.,* 146 F.3d 1305, 1307 (11th Cir.1998). In order for the plaintiff to satisfy his "obligation to provide the grounds of his entitlement to relief," he must allege more than "labels and conclusions"; his complaint must include "[f]actual allegations [adequate] to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (May 21, 2007) (citations and quotations omitted). Stated differently, the factual allegations in a complaint must "possess enough heft" to set forth "a plausible entitlement to relief," 127 S.Ct. at 1966-67. Moreover, "while notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential

allegations*1283 respecting all the material elements necessary to sustain a recovery under some viable legal theory.' " *Roe v. Aware Woman Ctr. for Choice, Inc.,* 253 F.3d 678, 683 (11th Cir.2001) (quoting *In re Plywood Antitrust Litig.,* 655 F.2d 627, 641 (5th Cir. Unit A Sept. 8, 1981)).

In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court endorsed the standing rule created by *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.1952), which permits only purchasers and sellers of securities, and those with contracts to purchase and sell securities, to bring suit under Rule 10b-5. The *Blue Chip Stamps* Court noted that three principal categories of plaintiffs are excluded from standing: (1) "potential purchasers of shares ... who allege that they decided not to purchase because of" the alleged violations; (2) "actual shareholders in the issuer who allege that they decided not to sell their shares because of" the alleged violations; and (3) "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5." *Blue Chip Stamps,* 421 U.S. at 737-38, 95 S.Ct. 1917. Stephens contends that FSA is thus excluded.

FSA contends that it has standing on four independent grounds: (1) as the true party at risk in this transaction, it was effectively the purchaser of the bonds; (2) it is entitled to standing as a guarantor of the bonds; (3) it actually purchased the securities pursuant to the terms of the insurance policy; and (4) it is fully subrogated to the rights of the individual bondholders and therefore entitled to bring suit based on their purchases.

### i. Party At Risk

[4] FSA suggests that as the true "party at risk" in the bond transaction, it should have standing to assert a claim under Rule 10b-5. That is, FSA argues that it satisfies the purchaser-seller requirement set forth in *Birnbaum* and endorsed by the Supreme Court in *Blue Chip Stamps,* because,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                    Page 9

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

as the insurer of the bonds, it bore the risk that a purchaser would ordinarily bear. FSA is mistaken, however, in interpreting the purchaser-seller requirement to entail a functional, and not a formal, inquiry. Although the Supreme Court discussed the functional aspects of the rule in its reasoning, the Court deliberately endorsed a standing rule that would not be subject to "endless case-by-case erosion" by courts employing a functional analysis to every new group of potential plaintiffs. *See Blue Chip Stamps,* 421 U.S. at 755, 95 S.Ct. 1917. Accordingly, FSA's assumption of risk in the bond transaction does not provide it with Rule 10b-5 standing.

### ii. Guarantor Standing

[5] FSA argues that it also has standing as a guarantor of the bonds. FSA first contends that it has standing as a guarantor because a guarantor qualifies as a purchaser of securities. This is not so. Granting standing to a guarantor as a purchaser would contravene the rule that this court announced in *Pelletier v. Stuart-James Co., Inc.,* 863 F.2d 1550 (11th Cir.1989), that, consistent with *Blue Chip Stamps,* a plaintiff must have actually purchased or sold, or entered into an enforceable contract to purchase or sell, securities to have standing under Rule 10b-5. *Id.* at 1554-55.

[6] FSA next advances the novel theory that, in insuring the bonds, it sold a security, that is, a guaranty. This argument fails because a guaranty does not *1284 qualify as a security for Rule 10b-5 purposes. Section 3(a)(10) of the Exchange Act defines a "security" as follows:
The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt of, or warrant or right to subscribe to or purchase, any of

the foregoing ....

15 U.S.C.A. § 78c(a)(10). As the foregoing definition does not include a guaranty, FSA lacks standing as a guarantor of the bonds.

### iii. Contract to Otherwise Acquire the Bonds

FSA further argues that its insurance policy constitutes a contract to purchase the Bonds, qualifying FSA as a purchaser pursuant to *Blue Chip Stamps.* Notably, § 3(a)(13) of the Exchange Act defines the term "purchase" to include "any contract to buy, purchase, or *otherwise acquire*" securities. *See*15 U.S.C. § 78c(a)(13) (emphasis added). The policy provides that
[u]pon disbursement in respect of a Bond, [FSA] shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by [FSA] hereunder.

Accordingly, FSA contends that it acquired a contingent interest in the bonds because the policy constitutes a contract to otherwise acquire them upon the occurrence of a specified contingent event, that is, default.

Stephens counters that FSA failed to allege a crucial element of a Rule 10b-5 action in its complaint-that it had purchased or sold a security. As Stephens notes, FSA did not specifically allege that it had entered into a contract to acquire the bonds. Nor did FSA attach the insurance policy or quote relevant terms of the policy in its complaint. Indeed, on reading the allegations in FSA's complaint, one could understand FSA to be advancing a theory of standing based solely on the fact that it suffered economic harm as a result of the defendant's alleged fraud, a basis that was rejected in *Blue Chip Stamps.*

[7] Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1368 (11th Cir.1997). This court recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss. *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999); *Brooks,* 116 F.3d at 1368-69. Here, FSA refers to the existence of the insurance policy and relies on the effect of the policy-that FSA is thereby required to make payments to the bondholders-though it does not quote from the policy or discuss its specific provisions. The question, then, is whether the policy is nevertheless "central" to FSA's federal securities claim.

[8] In considering this question, the First Circuit has held, with respect to a complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's **\*1285** motion to dismiss was central to the plaintiffs' claim because "[p]laintiffs unquestionably would have had to offer a copy of the article in order to prove their case." *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988). According to that standard-whether the plaintiff would have had to offer the document in order to prove its case-the policy would appear to be central to FSA's claim, for FSA would ultimately have to offer a copy of the policy to prevail under any conceivable theory of its case.

This case, however, presents a closer question than most cases in which this issue arises. The potential harm that courts are mindful of in these situations is the lack of notice that the attached document may be considered by the court. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Because Stephens attached the policy to its motion to dismiss, we cannot find that Stephens lacked notice that the district court or this court might consider the document. Accordingly, we will consider the policy appended to Stephens's motion to dismiss as part of the pleadings because it is referred to in the complaint, it is central to FSA's

federal securities claim, its consideration comports with the requirements of notice pleading, and neither party challenges its authenticity.

[9] Even considering the insurance policy, we conclude that FSA did not "otherwise acquire" a " security," and, therefore, FSA does not have standing to bring a claim under Rule 10b-5. Although by the insurance policy's own terms FSA acquired the bonds upon default by the Authority, we conclude that at the time of such transfer the instruments FSA acquired were no longer "securities " as required for standing under Rule 10b-5.

[10][11][12] "[T]o reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a 'security' as defined in [the] 1934 Act[ ]." *Home Guaranty Ins. Corp. v. Third Fin. Servs., Inc.* 667 F.Supp. 577, 579 (M.D.Tenn.1987). The Supreme Court has articulated three tests to determine whether an instrument is a "security" that is protected under the federal securities laws by means of being an "investment contract," "stock," or "note." First, an instrument is an "investment contract" if it "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). Second, the characteristics typically associated with "stock" are that it grants "the right to receive dividends contingent upon an apportionment of profits"; is negotiable; grants " the ability to be pledged or hypothecated"; " confer[s][ ] voting rights in proportion to the number of shares owned"; and has "the capacity to appreciate in value." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686, 105 S.Ct. 2297, 2302, 85 L.Ed.2d 692 (1985). Third, the factors to consider when determining if an instrument is a " note" are whether "the buyer is interested primarily in the profit the note is expected to generate[,] ... it is an instrument in which there is 'common trading for speculation or investment,' " the investing public reasonably expects the instrument to be a note, and no other "regulatory scheme significantly reduces the risk of the instrument." *Reves v. Ernst & Young,* 494 U.S. 56, 66-67, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

In this case, the very terms of the insurance policy and the OS regarding the revenue*1286 bonds explain why we conclude that FSA did not otherwise acquire a "security." Under the insurance policy, FSA was obligated to disburse " that portion of the principal of an interest on the Bonds that shall be Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer."[FN1] Once FSA disbursed the amount due for payment because of the Authority's non-payment, the insurance agreement specified that FSA became " owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond ... to the extent of any payment by Financial Security hereunder." According to FSA, this transfer of the bonds satisfied Rule 10b-5's requirement that they " otherwise acquired" a "security" through the insurance contract. We do not disagree that FSA acquired the bonds through operation of the insurance policy. However, although FSA became the "owner" of the bonds, it did not acquire a " security" because, by the OS's own terms, FSA acquired no right to receive interest or principal in the bonds after disbursement.[FN2] Under the OS, once the bonds or a portion of the bonds were redeemed, the owners of such bonds or portions thereof ceased to be entitled to any benefit or security under the Bond Resolution.

FN1. Under the insurance policy, "Due for Payment" means "(a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity ... and (b) when referring to interest on a Bond, payable on the stated date for payment of interest."

FN2. This case is distinguishable from those in which a bank accepts securities as collateral for a loan, because here, FSA

cannot recover monies from the "bonds" once acquired. *See Rubin v. United States,* 449 U.S. 424, 429-31, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (holding that pledging securities as collateral for a loan constitutes an "offer or sale" under § 17(a) of the Securities Act), *Marine Bank v. Weaver,* 455 U.S. 551, 554 n. 2, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (indicating, in a Rule 10b-5 case, that *Rubin* resolved the circuit split over whether "a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws" and making no distinction between the Securities Act and the Exchange Act for these purposes). Although both FSA and a bank using securities as collateral are impacted by default, the bank is relying on the value of the securities to recover some of their loss.

And although it may be true that occasionally a bank will recover nothing from the collateral because the securities have lost all of their value, the bank did not enter into the contract assuming such. Here, when FSA entered into the insurance contract, the terms were clear regarding the lack of value of the bonds after disbursement. As such, it cannot be said that FSA entered into the insurance contract assuming it could recover some of its losses from a default through liquidation of the bonds it had acquired.

On the date so designated for redemption ... Series 1998 Bonds or portions of Series 1998 Bonds so called for redemption will become and be due and payable at the Redemption Price provided for redemption of such Series 1998 Bonds or portions thereof on such date and ... such Bonds or portions thereof will cease to be entitled to any benefit or security under the Resolution and the Owners of such Bonds or portions thereof will have no rights in respect thereof except to receive payment of the Redemption Price thereof and the accrued interest and to the extent provided in the Resolution, and to receive Series 1998 Bonds for any unredeemed portions of Series 1998 Bonds.

As such, after FSA acquired the bonds it had no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276

Page 12

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

right to past payments of principal and interest because the obligation to pay *1287 those portions of the bond had been discharged by FSA's disbursement of the amount that was "due for payment."

Furthermore, FSA had no right to future payments. First, FSA owned the bonds only "to the extent of any payment" by FSA, and FSA has not disbursed future payments. Second, as the bonds for which disbursement had been made by FSA were no longer entitled to "any benefit or security under the Resolution" and the new owner, FSA, had no " rights in respect thereof," FSA was not entitled to any future payments on the bonds.

The "bonds" that FSA acquired at default, therefore, were not "securities" because they failed to satisfy the definitions of either an "investment contract," "stock," or "note" as articulated by the Supreme Court. First, the "bonds" were not an " investment contract" because FSA did not acquire any "profit to come solely from the efforts of others" through the "bonds." *W.J. Howey Co.*, 328 U.S. at 301, 66 S.Ct. 1100. FSA's profit in this transaction came from the consideration paid by the Authority for the issuance of the insurance policy, not from the bonds issued by the Authority. Second, the " bonds" were not "stocks" because they did not confer the right to vote or receive dividends and were not negotiable or transferable. *Landreth Timber Co.*, 471 U.S. at 686, 105 S.Ct. 2297. Third, the "bonds" were not "notes" because FSA was not "interested primarily in the profit the note is expected to generate." *Reves*, 494 U.S. at 66-67, 110 S.Ct. 945. As discussed above, it does not appear that the bond had the potential to generate any profit for FSA because FSA discharged the debt obligations. Furthermore, FSA issued the policy in return for consideration from the Authority, not to invest in the bonds. Although "most instruments bearing [ ] a traditional title are likely to be covered by the definition [of a security] ... the label ... is not of itself sufficient to invoke the coverage of the Acts." *Landreth Timber Co.*, 471 U.S. at 686, 105 S.Ct. 2297. Rather, the "economic realities" of the instrument actually conveyed ultimately govern whether the insurance contract is a security. *Reves*, 494 U.S. at 62, 110 S.Ct. 945. Because the "bonds"

that FSA acquired under the insurance policy were not "securities" within the meaning of the Exchange Act, 15 U.S.C. § 78c(a)(1), the "bonds" did not confer standing for FSA to allege a violation of Rule 10b-5.

### iv. Subrogation

[13][14] Finally, FSA argues that it has standing based on subrogation. "Subrogation is '[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.' " *Jones Motor Co. v. Anderson*, 268 Ga.App. 458, 602 S.E.2d 228, 230 (2004) (quoting Black's Law Dictionary 1427 (6th ed.1990)); *see also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Subrogation is either "legal" or " conventional." Legal subrogation is an equitable doctrine and arises by operation of the law without any agreement to that effect between the parties; conventional subrogation rests on contract, arising where "an agreement is made that the person paying the debt shall be subrogated to the rights and remedies of the original creditor." *Gilbert v. Dunn*, 218 Ga. 531, 128 S.E.2d 739, 740 (1962) (citation omitted); *see also State Farm Mut. Auto. Ins. Co. v. Cox*, 271 Ga. 77, 515 S.E.2d 832, 833 (1999). FSA argues that it has standing as a subrogee under both varieties of subrogation because: (1) it was obligated by contract to make interest and principal payments on the bonds, and it alleged that it was doing so; and (2) the insurance policy expressly stated that upon *1288 disbursement, FSA becomes "fully subrogated to the rights of the [bondholder]."

Stephens does not dispute that had FSA properly pleaded a subrogation claim, it might be entitled to standing.[FN3] Stephens argues, however, that FSA cannot recover under this theory because it failed to allege every element of a bondholder claim, as it must according to Georgia law. *See, e.g., S. Nitrogen Co. v. Stevens Shipping Co.*, 114 Ga.App. 581, 151 S.E.2d 916, 921 (1966) (holding that, when proceeding upon the theory of conventional subrogation, it is essential that a plaintiff "allege

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                     Page 13

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

facts showing the existence of a cause of action on the part of [the subrogor] against the defendant").

> FN3. Amicus, the Bond Market Association, asserts that there is no automatic subrogation to Rule 10b-5 rights. However, the Association fails to cite any controlling authority to that effect. Instead, the Association cites three district court opinions, two of which are unpublished, from outside of this circuit.

[15] It appears clear that the bondholders in this case would have standing to bring a claim under Rule 10b-5, as they were the actual purchasers of the bonds. In its complaint, however, FSA failed to allege harm to the bondholders caused by the misrepresentations of Stephens. Instead, FSA alleged that Stephens "deceive[d] FSA" and "made material misrepresentations ... for the purpose and effect of inducing FSA to insure the Bonds issued by the Authority." FSA goes on to allege that, as a result, "FSA could not properly assess the risk factors associated with insuring the Bonds." As a subrogee, FSA cannot file a complaint based on the harm it suffered itself. *See Liberty Nat'l Ins. Holding Co. v. Charter Co.,* 734 F.2d 545, 554 (11th Cir.1984). We conclude, therefore, that FSA did not have standing to bring a claim under Rule 10b-5 for harms it suffered, rather than harm suffered by the bondholders, under the theory of subrogation.

### B. Statute of Limitations and Due Diligence

Stephens argues that, regardless of whether FSA has standing, FSA's Rule 10b-5 claim is time-barred and FSA's failure to perform due diligence bars it from bringing a Rule 10b-5 action. As we have already concluded that FSA lacks standing to bring a claim under Rule 10b-5, we need not address these issues.

### C. State Law Fraud and Negligent Misrepresentation Claims

The district court granted summary judgment in

favor of Stephens and Hayes James on FSA's common law fraud and negligent misrepresentation claims, holding that: (1) Stephens and Hayes James did not owe FSA a duty to disclose, (2) the alleged misrepresentations were not actionable, and (3) FSA did not justifiably rely on any alleged misrepresentations because it failed to exercise due diligence as a matter of law.

We review the district court's grant of summary judgment *de novo,* drawing all inferences in favor of the non-moving party. *Korman v. HBC Fla., Inc.,* 182 F.3d 1291, 1293 (11th Cir.1999).

[16][17] Under Georgia law, a plaintiff alleging fraud must demonstrate: (1) a false representation by the defendant, (2) the defendant's knowledge that the information is false (scienter), (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff. *See, e.g., Avery v. Chrysler Motors Corp.,* 214 Ga.App. 602, 448 S.E.2d 737, 739 (1994). To prove negligent misrepresentation, a plaintiff must establish: "(1) the defendant's negligent supply of false information to foreseeable persons, known or **\*1289** unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *See Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.,* 267 Ga. 424, 479 S.E.2d 727, 729 (1997). In advancing either claim, therefore, a plaintiff must establish that the defendant made false representations on which the plaintiff justifiably relied.

### i. Claims Against Hayes James

[18][19] FSA argues that it justifiably relied on both Hayes James's BCL and the description of Hayes James's Acceptance Test contained in the RFP. To establish reasonable reliance under Georgia law as to either fraud or negligent misrepresentation, a plaintiff must show that it exercised due diligence. *White v. BDO Seidman, LLP,* 249 Ga.App. 668, 549 S.E.2d 490, 494 (2001) (negligent misrepresentation); *Bogle v. Bragg,* 248 Ga.App. 632, 548 S.E.2d 396, 400-01 (2001) (fraud).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

Georgia law places a significant due diligence burden on sophisticated parties engaged in arms-length transactions, such as the bond transaction at issue here. *See, e.g., William Goldberg & Co. v. Cohen,* 219 Ga.App. 628, 466 S.E.2d 872, 877 (1995). Although questions of due diligence are generally for the jury to decide, a court can find that a party has failed to exercise due diligence as a matter of law where due diligence failures are particularly egregious. *See, e.g., Wender & Roberts, Inc. v. Wender,* 238 Ga.App. 355, 518 S.E.2d 154, 159 (1999).

[20] Because FSA failed to put forth any evidence that any of its employees had actually read the Hayes James BCL,[FN4] we agree with the district court that FSA cannot prove that it justifiably relied on any alleged misrepresentation or omission in that document.

> FN4. Ron Millet, FSA's in-house counsel, stated in an affidavit that he "relied on [the BCL] to the extent that [he] knew FSA required its receipt prior to the bond closing." That statement, however, does not help FSA. Because Millet did not rely on the contents of the BCL, he could not have relied on any alleged misrepresentations contained therein.

Likewise, we find that FSA did not justifiably rely on any alleged misrepresentation contained in the description of the Acceptance Test found in the RFP. FSA failed to perform any due diligence with respect to the Acceptance Test. FSA did not ask Hayes James or Stephens any questions regarding the Acceptance Test and did not even inquire as to whether the Facility passed the test. Nor did FSA request a copy of the report prepared in connection with the Acceptance Test. Accordingly, we hold as a matter of law that FSA failed to meet its due diligence burden, both with respect to the BCL and the description of the Acceptance Test contained in the RFP. Because we conclude that FSA failed to exercise due diligence with respect to either of the above documents, we need not consider whether Hayes James owed FSA a duty to disclose or whether Hayes James's alleged misrepresentations

were actionable.

### ii. Claims Against Stephens

[21] FSA claims that Stephens committed fraud and made negligent misrepresentations under Georgia law in four documents: the RFP, the POS, the OS, and the BCL. Because we have already held that FSA did not justifiably rely on the BCL, we will address only the alleged misrepresentations and omissions in the remaining three documents.[FN5]

> FN5. The district court ruled that FSA failed to introduce competent evidence that anyone at FSA read the OS. However, in light of FSA's argument that in reviewing drafts of the POS, Millet effectively reviewed the OS (which is dated as of the closing date), we will assume for purposes of this appeal that Millet reviewed both the POS and the OS.

**\*1290** As an initial matter, we note that the district court excluded the evidence offered by FSA regarding due diligence standards in the bond insurance industry. As FSA has not appealed that ruling, we do not consider the testimony of FSA's experts regarding those standards.

Regardless of whether the RFP, the POS, and the OS contained material misrepresentations, FSA cannot prevail on its fraud and negligent misrepresentation claims due to its abject failure to satisfy its due diligence burden.[FN6] FSA failed to perform any due diligence regarding the tonnage figures in the RFP, the POS, and the OS, instead relying entirely on Stephens's representations. FSA could have discovered the discrepancies in tonnage figures that it now cites had it requested tonnage reports for the months preceding the Bond Closing. In addition, Gifford could have contacted the Authority, TransWaste or the Participants to confirm the actual tonnage figures. Furthermore, Stephens notes that some of the information that FSA received, including quotations in articles accompanying the RFP to the effect that the Facility would require 1,250 tons of waste per day to break

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 1276                                                                                    Page 15

500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15
**(Cite as: 500 F.3d 1276)**

even, should have prompted FSA to investigate further. In fact, FSA failed to seek any information regarding the Facility's performance in the months leading up to the Bond Closing. Had it done so, it could have discovered the alleged misrepresentations relating to the Facility's MOV recovery rates and its operational problems.

> FN6. FSA argues that the question of whether a party justifiably relied on alleged misrepresentations "should not be decided on summary judgment if there is *any* evidence showing the person exercised due diligence." *Potts v. UAP-GA AG CHEM, Inc.,* 256 Ga.App. 153, 567 S.E.2d 316, 320 (2002) (citations omitted; emphasis added). However, *Potts* did not involve sophisticated parties engaged in an arms-length transaction. *See id.* Georgia law imposes a much heavier due diligence burden on parties like FSA. *See, e.g., William Goldberg & Co. v. Cohen,* 219 Ga.App. 628, 466 S.E.2d 872, 877 (1995).

Most important, perhaps, FSA failed to perform any due diligence relating to TransWaste. Gifford identified the Participants' put or pay contracts as the ultimate security for the bonds, but she failed to recognize the importance of TransWaste's contribution to the success of the Facility. TransWaste was responsible for a significant portion of the Facility's revenue, yet Gifford failed to discuss the Facility with TransWaste, inquire into TransWaste's financial wherewithal (to assess its ability to meet its performance guaranty) or, for that matter, review its contract. We hold that this due diligence failure was so egregious that FSA could not have reasonably relied on any representation relating to TransWaste.

We therefore agree with the district court that the facts regarding FSA's due diligence efforts, taken together, failed to create a triable issue of fact as to whether FSA justifiably relied on Stephens's representations. Because we hold that FSA did not reasonably rely on any of the alleged misstatements or omissions made by Stephens, we need not consider whether, and to what extent, Stephens

owed FSA a duty of disclosure or whether its alleged misrepresentations were actionable.

### IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on FSA's state law claims and the dismissal of FSA's federal securities claim.

C.A.11 (Ga.),2007.
Financial Sec. Assur., Inc. v. Stephens, Inc.
500 F.3d 1276, Fed. Sec. L. Rep. P 94,399, 21 Fla. L. Weekly Fed. C 15

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

894 So.2d 643                                                                    Page 1

894 So.2d 643
**(Cite as: 894 So.2d 643)**

**H**
State Farm Mut. Auto. Ins. Co. v. Brown
Ala.,2004.

Supreme Court of Alabama.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY
v.
Judy BROWN and Michael Brown.
**1030709.**

June 25, 2004.

**Background:** After injured motorist and her husband sued alleged tortfeasor alleging negligence and/or wantonness and loss of consortium, motorist and husband filed declaratory-judgment complaint against tortfeasor's liability insurer, seeking declaration as to the amount of liability insurance coverage available under tortfeasor's policy. The Etowah Circuit Court, No. CV-2001-095,William W. Cardwell, Jr., J., entered partial summary judgment for motorist and husband on their claim against insurer, and certified the partial summary judgment as final and appealable. Insurer appealed.

**Holding:** The Supreme Court held that the direct-action statute barred motorist and husband from seeking declaratory judgment against insurer before obtaining a judgment against tortfeasor.

Reversed and remanded.
West Headnotes
**[1] Appeal and Error 30 ⇒893(1)**

30 Appeal and Error
   30XVI Review
     30XVI(F) Trial De Novo
      30k892 Trial De Novo
       30k893 Cases Triable in Appellate Court

30k893(1) k. In General. Most Cited Cases
The Supreme Court's review of a summary judgment is de novo.

**[2] Appeal and Error 30 ⇒863**

30 Appeal and Error
   30XVI Review
     30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
       30k863 k. In General. Most Cited Cases
In reviewing the disposition of a motion for summary judgment, the Supreme Court utilizes the same standard as the trial court in determining whether the evidence before it made out a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Rules Civ.Proc., Rule 56(c).

**[3] Judgment 228 ⇒185(2)**

228 Judgment
   228V On Motion or Summary Proceeding
     228k182 Motion or Other Application
      228k185 Evidence in General
       228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases

**Judgment 228 ⇒185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
     228k182 Motion or Other Application
      228k185 Evidence in General
       228k185(5) k. Weight and Sufficiency. Most Cited Cases
When the movant for summary judgment makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Rules Civ.Proc., Rule 56(c).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643

894 So.2d 643
**(Cite as: 894 So.2d 643)**

**[4] Evidence 157 ☞597**

157 Evidence
   157XIV Weight and Sufficiency
     157k597 k. Sufficiency to Support Verdict or
Finding. Most Cited Cases
"Substantial evidence" is evidence of such weight
and quality that fair-minded persons in the exercise
of impartial judgment can reasonably infer the
existence of the fact sought to be proved.

**[5] Appeal and Error 30 ☞934(1)**

30 Appeal and Error
   30XVI Review
     30XVI(G) Presumptions
       30k934 Judgment
         30k934(1) k. In General. Most Cited
Cases
In reviewing the disposition of a motion for
summary judgment, the Supreme Court must review
the record in a light most favorable to the
nonmovant and must resolve all reasonable doubts
against the movant. Rules Civ.Proc., Rule 56(c).

**[6] Declaratory Judgment 118A ☞393**

118A Declaratory Judgment
   118AIII Proceedings
     118AIII(H) Appeal and Error
       118Ak392 Appeal and Error
         118Ak393 k. Scope and Extent of
Review in General. Most Cited Cases
The Supreme Court's review of a declaratory
judgment is generally governed by the ore tenus
standard of review; however, in cases where there
are no disputed facts and where the judgment is
based entirely upon documentary evidence, no such
presumption of correctness applies, and the
Supreme Court's review is de novo.

**[7] Declaratory Judgment 118A ☞165**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
     118AII(G) Written Instruments and Contracts
       118AII(G)2 Insurance
         118Ak165 k. Liability or Indemnity
Insurance in General. Most Cited Cases

**Insurance 217 ☞3549(3)**

217 Insurance
   217XXXI Civil Practice and Procedure
     217k3544 Conditions Precedent
       217k3549 Liability or Indemnity Insurance
         217k3549(2) Judgment or Settlement
Agreement
           217k3549(3) k. In General. Most
Cited Cases
Direct-action statute, giving judgment creditors who
recover final judgment from an insured the right to
have the insurance proceeds provided for in the
contract of insurance applied to the satisfaction of
the judgment, barred injured motorist and her
husband from seeking declaratory judgment against
alleged tortfeasor's liability insurer regarding the
amount of available liability coverage, where
motorist and husband had not yet obtained a
judgment against alleged tortfeasor on their claims
negligence and/or wantonness and loss of
consortium, and, thus, there was no justiciable
controversy. Code 1975, §§ 6-6-223, 27-23-2.

**[8] Declaratory Judgment 118A ☞61**

118A Declaratory Judgment
   118AI Nature and Grounds in General
     118AI(D) Actual or Justiciable Controversy
       118Ak61 k. Necessity. Most Cited Cases
A bona fide justiciable controversy is essential to
maintain a declaratory-judgment action. Code
1975, § 6-6-223.

**[9] Declaratory Judgment 118A ☞68**

118A Declaratory Judgment
   118AI Nature and Grounds in General
     118AI(D) Actual or Justiciable Controversy
       118Ak68 k. Future or Contingent
Questions. Most Cited Cases
A controversy is justiciable, such that a
declaratory-judgment action may be maintained,
when present legal rights are affected, not when a
controversy is merely anticipated. Code 1975, §
6-6-223.

**[10] Declaratory Judgment 118A ☞66**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643

894 So.2d 643
**(Cite as: 894 So.2d 643)**

118A Declaratory Judgment
   118AI Nature and Grounds in General
      118AI(D) Actual or Justiciable Controversy
         118Ak66 k. Advisory Opinions. Most Cited Cases
The declaratory-judgment statute does not empower a court to give an advisory opinion. Code 1975, § 6-6-223.

**[11] Statutes 361 ☞194**

361 Statutes
   361VI Construction and Operation
      361VI(A) General Rules of Construction
         361k187 Meaning of Language
            361k194 k. General and Specific Words and Provisions. Most Cited Cases
A statutory provision relating to a specific subject is understood to act as an exception to a provision relating to general subjects.

*644 Mark D. Hess of Haskell Slaughter Young & Rediker, LLC, Birmingham; and J. Curtis Wright of Dortch, Wright & Wright, Gadsden, for appellant.

Michael L. Roberts of Cusimano, Keener, Roberts, Kimberley & Miles, P.C., Gadsden, for appellees.

PER CURIAM.

Judy Brown and Michael Brown asserted a claim against State Farm Mutual Automobile Insurance Company, the liability insurer for the alleged tortfeasor, Waylon Gant, seeking a declaratory judgment as to the amount of liability insurance coverage available under Gant's State Farm policy to indemnify Gant should the Browns succeed in the action the Browns had filed against Gant. The Browns had sued Gant, with whom Judy Brown had been involved in a motor-vehicle accident, alleging claims of negligence and/or wantonness on behalf of Judy Brown, and a claim of loss of consortium on behalf of Michael Brown. State Farm contended that under its policy with Gant, only $50,000 coverage was available to the Browns; the Browns cited *Tate v. Allstate Insurance Co.,* 692 So.2d 822 (Ala.1997), for their argument that they are entitled to $100,000 under Gant's State Farm policy-$50,000 for Judy's claim and $50,000 for Michael's loss-of-consortium claim. State Farm also included in its answer the affirmative defense

that the claim asserted by the Browns against State Farm is a direct action against State Farm before a judgment has been entered against its insured, in contravention of Ala.Code 1975, § 27-23-2. On March 26, 2001, the Browns filed a motion for a partial summary judgment on their claim against State Farm. On September 12, 2003, the trial court granted the Browns' motion for a partial summary judgment. State Farm filed a motion to vacate the partial summary judgment and motion to dismiss or, in the alternative, to certify the partial summary judgment as final and appealable pursuant to Rule 54(b), Ala.R.Civ.P. On December 15, 2003, the trial court denied State Farm's motion to vacate the September 12, 2003, partial summary judgment, but certified the September 12 partial summary judgment and the December 15 order as final for purposes of appeal. State Farm filed a timely notice of appeal. On appeal State Farm contends that the claim against it should have been dismissed because the assertion of that claim *645 was in essence a direct action against an insurance company before a judgment has been entered against the insured/alleged tortfeasor, which violates state law; that the limits of Gant's liability coverage available for Judy Brown's personal injuries and Michael Brown's derivative loss-of-consortium claim is the $50,000 "[e]ach [p]erson" coverage limit applicable to Judy Brown's injuries; and that the trial court's interpretation of the insurance policy, in light of *Weekley v. State Farm Mutual Automobile Insurance Co.,* 537 So.2d 477 (Ala.1989), is in error. We reverse and remand.

*Facts*

On or about November 29, 1999, Waylon Gant was involved in a motor-vehicle accident with Judy Brown, who sustained severe physical injuries. Gant is insured under an automobile liability policy issued by State Farm. The "liability" coverage section of Gant's State Farm policy provides, in part, that State Farm will "pay damages which an insured becomes legally obligated to pay because of ... bodily injury to others...." The policy defines " bodily injury" as "bodily injury to a person and sickness, disease or death which results from it."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643
**(Cite as: 894 So.2d 643)**

The definition of "bodily injury" contains no words like "loss of services" or "loss of consortium" or any language similar to those words. The limits of Gant's liability coverage for bodily injury under the policy is $50,000 for "[e]ach [p]erson" and $100,000 for "[e]ach [a]ccident." Specifically, the limits of liability for bodily injury in Gant's policy provide:

"Under 'Each Person' is the amount of coverage for all damages due to bodily injury to one person. ' Bodily injury to one person' includes all injury and damages to others resulting from this bodily injury. Under 'Each Accident' is the total amount of coverage, subject to the amount shown under 'Each Person,' for all damages due to bodily injury to two or more persons in the same accident."

On January 24, 2001, the Browns sued Gant in the Etowah Circuit Court, alleging that he had been negligent and/or wanton and that his negligence and/or wantonness had caused the November 29, 1999, accident. The complaint alleges that the injuries Judy sustained in the accident exceed $50,000. Judy's husband, Michael, who was not in the car at the time of the accident, claims to have " lost the services, comfort and consortium of his wife Judy Brown" as a result of the accident and claims that that loss exceeds $50,000 in damages. The Browns also asserted a direct claim, titled " Complaint for Declaratory Judgment," against State Farm as Gant's liability insurer seeking a declaration that, based on this Court's decision in *Tate v. Allstate Insurance Co.,* supra, the policy should be "interpreted so as to provide $50,000 coverage for Judy Brown's claims and an additional $50,000 coverage for Michael Brown's claims."

On February 16, 2001, State Farm filed its answer to the Browns' declaratory-judgment complaint, asserting, among other things, the affirmative defenses that the Browns' claim against State Farm was a prohibited direct action against an adversary's liability insurer, and that the bodily-injury liability limits for "[e]ach [p]erson" under the language of Gant's State Farm policy "were not expanded by a derivative claim asserted by a person not having received any bodily injury [i.e., Michael Brown]." State Farm relied upon this Court's opinion in

*Weekley,* supra, in arguing that the coverage afforded Gant for both Judy Brown's claim for damages for bodily injuries and Michael Brown's derivative claim for damages for loss of consortium is limited to $50,000 for bodily injury to one person. On March 15, 2001, Gant *646 filed his answer to the Browns' complaint, denying liability for negligence, wantonness, or any other wrongful conduct.

On March 26, 2001, the Browns filed a motion for partial summary judgment, [FN1] supported by a certified copy of Gant's State Farm policy. In that motion, the Browns argued that *Tate,* supra, entitled them to a judgment declaring as a matter of law that Gant's State Farm policy afforded Gant "a total of $100,000 in coverage for their claims." State Farm opposed the motion on two grounds; it argued 1) that *Maness v. Alabama Farm Bureau Mutual Casualty Insurance Co.,* 416 So.2d 979 (Ala.1982), prohibited a direct action against State Farm before a judgment has been had against the alleged tortfeasor/policyholder, and 2) that, even if *Maness* does not prohibit such a direct action, the insurance coverage available to Gant was limited to the $50,000 "[e]ach [p]erson" limit for both Judy's personal-injury claim and Michael's derivative loss-of-consortium claim. The Browns submitted a reply memorandum in response to State Farm's opposition reiterating that *Tate* controlled and arguing that *Weekley* had been at least partially abrogated by *City of Lanett v. Tomlinson,* 659 So.2d 68 (Ala.1995).

> FN1. The Browns' motion sought only a partial summary judgment regarding their claim against State Farm; their motion did not address their negligence and/or wantonness claims against Gant.

On September 12, 2003, the trial court, relying upon *Tate* and *City of Lanett,* entered an order, stating:

"The Court hereby declares that the total amount of coverage from the State Farm policy which affords coverage to defendant Gant is $50,000 for the claims of the [sic] Judy Brown, and an additional $50,000 for the claims of her husband Michael

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643                                                                 Page 5

894 So.2d 643
**(Cite as: 894 So.2d 643)**

Brown, for a total of $100,000 in coverage."

On October 9, 2003, State Farm filed a motion to vacate the judgment and to dismiss the claim against it or, in the alternative, to certify the partial summary judgment as final pursuant to Rule 54(b), Ala.R.Civ.P., arguing that the direct-action statute, Ala.Code 1975, § 27-23-2, and *Maness* precluded the Browns' direct declaratory-judgment claim against State Farm and that *Tate* and *Weekley* served to limit the liability coverage available under Gant's policy to the $50,000 "[e]ach [p]erson" limit, i.e., to $50,000 for "all damages due to bodily injury to one person." On December 15, 2003,[FN2] the trial court denied State Farm's motion to vacate or dismiss but expressly certified the partial summary judgment as final for purposes of Rule 54(b), Ala.R.Civ.P. State Farm timely appealed.

> FN2. The December 15, 2003, order was filed with the circuit clerk on January 6, 2004.

### Standard of Review

[1][2][3][4][5] We review a summary judgment under the following standard:
"This Court's review of a summary judgment is de novo.

" 'In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,"*Bussey v. John Deere Co.,* 531 So.2d 860, 862 (Ala.1988), and whether the movant was " entitled to a judgment as a matter of law." *Wright v. Wright,* 654 So.2d 542 (Ala.1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no **\*647** genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. *Bass v. SouthTrust Bank of Baldwin County,* 538 So.2d 794, 797-98 (Ala.1989). Evidence is " substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *Wright,* 654 So.2d at 543 (quoting *West v. Founders Life Assurance Co. of Florida,* 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. *Wilma Corp. v. Fleming Foods of Alabama, Inc.,* 613 So.2d 359 (Ala.1993) [overruled on other grounds, *Bruce v. Cole,* 854 So.2d 47 (Ala.2003)]; *Hanners v. Balfour Guthrie, Inc.,* 564 So.2d 412, 413 (Ala.1990).' "

*Pittman v. United Toll Sys., LLC,* 882 So.2d 842, 844 (Ala.2003). Also, in *Callaway v. Whittenton,* 892 So.2d 852 (Ala.2003), this Court stated:" ' " Regarding a question of law, ... this Court indulges no presumption of correctness as to the trial court's ruling." ' "

(Quoting *Eagle Prods., Inc. v. Glasscock,* 882 So.2d 280, 282 (Ala.2003), quoting in turn *Bell v. T.R. Miller Mill Co.,* 768 So.2d 953, 956 (Ala.2000) .)

[6] The same standard applies to a declaratory judgment:
"Our review of a declaratory judgment is generally governed by the ore tenus standard of review. However, in cases such as this, where there are no disputed facts and where the judgment is based entirely upon documentary evidence, no such presumption of correctness applies; our review is de novo."

*Alfa Mut. Ins. Co. v. Small,* 829 So.2d 743, 745 (Ala.2002).

### Analysis

[7] State Farm argues that the trial court erred on two grounds. State Farm first argues that by allowing the Browns to go forward with their claim against State Farm the trial court allowed the Browns to pursue a direct action against an insurance company, something State Farm alleges is not permitted by Ala.Code 1975, § 27-23-2. State Farm next argues that the trial court improperly expanded the liability limits of Gant's policy in order to ensure that Michael would be eligible for $50,000 in damages on his derivative

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643

894 So.2d 643
(Cite as: 894 So.2d 643)

Page 6

loss-of-consortium claim. Because of our resolution of State Farm's first argument, we need not address its second argument.

Section 27-23-2, Ala.Code 1975, provides, in pertinent part:
"Upon the recovery of a final judgment ..., if the defendant in such action was insured against the loss or damage at the time when the right of action arose, the judgment creditor shall be entitled to have the insurance money provided for in the contract of insurance between the insurer and the defendant applied to the satisfaction of the judgment ...."

State Farm argues that this statute establishes the necessity of a "recovery of a final judgment" before a direct action can be filed against an insurance company to recover for the actions of an insured. The Browns have not yet obtained a judgment against Gant.

This Court addressed Ala.Code 1975, § 27-23-2, in *Maness,* supra, which addressed the question " whether a plaintiff in a personal injury action ... can in effect bring a declaratory judgment action,"**648** 416 So.2d at 981, against the alleged tortfeasor's insurance carrier before a judgment is rendered against the tortfeasor. Maness, a volunteer fireman for the Sylacauga Fire Department, was injured when the Weogufka Fire Department's unoccupied truck moved down an incline and pinned him between that fire truck and another fire truck. The Manesses sued several individual defendants associated with the Weogufka Fire Department. Each of those defendants had insurance carriers. One of those carriers was Farm Bureau, which initiated a declaratory-judgment action seeking to determine its liability. The Manesses then filed a counterclaim against Farm Bureau, asking the court to determine whether Farm Bureau was obligated to defend its insured and to indemnify its insured for any judgment rendered against the insured. The Manesses filed cross-claims against the insurance carriers insuring one of the individual defendants, asking the trial court to determine whether each or all of the carriers were obligated to defend and indemnify their insured. The trial court dismissed the Manesses' cross-claims against the insurance

carriers. This Court affirmed the judgment of the trial court, stating:
"The injured party, however, can bring an action against the insurer only after he has recovered a judgment against the insured and only if the insured was covered against the loss or damage at the time the injured party's right of action arose against the insured tort-feasor."

416 So.2d at 981-82. The opinion explained that the Manesses' declaratory-judgment action was an improper direct action prohibited by Ala.Code 1975, §§ 27-23-1 and -2."We hold that the cross-claims of the Manesses against the insurance carriers are a form of direct action against an insurance carrier and not allowable under Alabama law because an injured party cannot bring a direct action against the insurance carrier, absent a final judgment against its insured, see, Code 1975, §§ 27-23-1 and -2. Therefore, the dismissal of the cross-claims by the trial court was proper."

416 So.2d at 982. See also *Knox v. Western World Ins. Co.,* 893 So.2d 321 (Ala.2004) (affirming order dismissing plaintiff's declaratory-judgment claim on basis that final judgment had not been entered against insured/alleged tortfeasor); *Wiggins v. State Farm Fire & Cas. Co.,* 686 So.2d 218, 220 (Ala.1996) (quoting *Maness* for the proposition that an injured party " 'can bring an action against the insurer only after he has recovered a judgment against the insured' "); *Hicks v. Alabama Pest Servs., Inc.,* 548 So.2d 148, 150 (Ala.1989) (judgment had not been entered for plaintiff; therefore, plaintiff had no right to pursue cause of action against insurance company); *Stewart v. State Farm Ins. Co.,* 454 So.2d 513, 514 (Ala.1984) (citing *Maness* and holding that a plaintiff could not bring a direct action against the alleged tortfeasor's liability insurer under a third-party-beneficiary theory); *Howton v. State Farm Mut. Auto. Ins. Co.,* 507 So.2d 448, 450 (Ala.1987) (noting *Maness, Stewart,* and other cases in holding that a plaintiff may not maintain a direct action against an insurer before a judgment has been rendered against the insured/alleged tortfeasor unless the insurer causes an independent injury to the plaintiff).

The Browns argue that Ala.Code 1975, § 6-6-223,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643                                                                                               Page 7

894 So.2d 643
**(Cite as: 894 So.2d 643)**

the declaratory-judgment statute, gives the court the right to render "declarations of rights, status or other legal relations thereunder" for anyone " affected" by a "contract." They also argue that the language of § 27-23-2 is permissive, not prohibitory, and that they are not trying to "reach and apply the insurance money" allegedly provided by the policy *649 State Farm issued to Gant. The Browns cite no cases in support of these arguments. The Browns claim that State Farm's position would implement an "implied repeal" of Ala.Code 1975, § 6-6-223. The Browns distinguish the cases relied upon by State Farm by stating that "most of the cases cited by State Farm represent a plaintiff's attempt to seek money damages directly from the liability insurer prior to judgment." (Browns' brief, p. 4.)

The Browns attempt to distinguish *Maness,* a case involving a declaratory judgment, by stating that the Manesses did not proceed under § 6-6-223 but specifically invoked § 27-23-2. The *Maness* opinion does not even mention § 6-6-223. However, the question in that case, as posed by the *Maness* Court, was whether a plaintiff "can in effect bring a declaratory judgment action" against an insurer before a judgment is entered against the insured/alleged tortfeasor. See also *Knox v. Western World Ins. Co.,* supra; *MacMillan-Bloedel, Inc. v. Firemen's Ins. Co. of Newark,* 558 F.Supp. 596, 599 (S.D.Ala.1983) (stating that in *Maness,* "the Alabama Supreme Court expressly held that an injured plaintiff could not maintain a declaratory judgment action against insurance carriers of the insured defendant" until the plaintiff has recovered a judgment against the insured).

State Farm argues in reply that in specifically referring to Ala.Code 1975, §§ 27-23-1 and -2, this Court in *Maness* considered and rejected the argument the Browns are now advancing–that they are sufficiently "interested" for their action to fit within the meaning of § 6-6-223. In summary, as we stated in *Maness,* in an action against an insured tortfeasor, the plaintiff has a vested interest in the coverage of the liability insurance policy that is secondary to that of the defendant/insured, who has the primary interest.

[8] Like any other action, a bona fide justiciable controversy is essential to maintain a declaratory-judgment action. *Harper v. Brown, Stagner, Richardson, Inc.,* 873 So.2d 220, 223 (Ala.2003) (to maintain a declaratory-judgment action, there must be a "bona fide justiciable controversy" between the parties); *Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C.,* 828 So.2d 285, 288 (Ala.2002) (" '[a]ll that is required for a declaratory judgment action is a *bona fide* justiciable controversy' " (quoting *Gulf South Conference v. Boyd,* 369 So.2d 553, 557 (Ala.1979) )). State Farm argues that there is no justiciable controversy between the Browns and State Farm to justify a direct action against it like the one filed by the Browns.

[9][10] A controversy is justiciable when present legal rights are affected, not when a controversy is merely anticipated. See *Creola Land Dev., supra; Baldwin County v. Bay Minette,* 854 So.2d 42, 45 (Ala.2003). Nor does the declaratory-judgment statute empower a court to give an advisory opinion. *Hornsby v. Sessions,* 703 So.2d 932 (Ala.1997). The Browns' negligence and wantonness and loss-of-consortium claims against Gant remain pending, and the Browns have yet to obtain a judgment against Gant awarding the Browns damages that would initiate any duty on the part of State Farm to indemnify Gant. Therefore, any question as to whether State Farm would owe anything to the Browns in the future is speculative at best.

[11] State Farm also contends that the direct-action statute, § 27-23-2, does not conflict with the declaratory-judgment statute, § 6-6-223, because, it argues, even without the application of § 27-23-2, no court is empowered by § 6-6-223 to decide a hypothetical question or issue an advisory opinion. Even if a conflict between*650 those statutes existed, a statutory provision relating to a specific subject is understood to act as an exception to a provision relating to general subjects. *Murphy v. City of Mobile,* 504 So.2d 243 (Ala.1987). In this case, the specific direct-action statute acts as an exception to the general declaratory-judgment statute.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 So.2d 643

Page 8

894 So.2d 643
**(Cite as: 894 So.2d 643)**

We agree with State Farm's argument that § 27-23-2 prevents the Browns from bringing this action at this time and in this posture. There is no justiciable controversy because the Browns have yet to obtain a judgment against Gant that would obligate State Farm to the Browns in any way. Therefore, the trial court erred in granting the Browns' motion for a partial summary judgment because the Browns' claim violates the direct-action statute, § 27-23-2, as that statute was interpreted in *Maness.* If the Browns obtain a judgment against Gant, the defendant/alleged tortfeasor, then, if necessary, they may pursue an action against State Farm to determine if the $50,000 liability limit is available to Michael on his derivative loss-of-consortium claim.

State Farm also argues that even if the direct-action statute did not prohibit this action, the trial court erred in determining that Michael, for his derivative loss-of-consortium claim, should under Gant's policy be entitled to $50,000 separate from the $50,000 in liability coverage Judy would under Gant's policy be entitled to for her personal injuries. We need not address this question because our resolution of the first issue renders moot the need for us to address the second.

We reverse the judgment of the trial court and remand the case for the trial court to enter a judgment granting State Farm's motion to vacate the summary judgment in favor of the Browns and to dismiss the claims against State Farm on the basis of the direct-action statute, Ala.Code 1975, § 27-23-2.

REVERSED AND REMANDED.

HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
Ala.,2004.
State Farm Mut. Auto. Ins. Co. v. Brown
894 So.2d 643

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

West Reporter Image (PDF)

470 So.2d 1226, 103 Lab.Cas. P 55,514

Supreme Court of Alabama.
Lamar MILLS, Willie R. Allen, Donice Anderson and James Anderson
v.
R.D. WELK, Randolph Johnston, W.R. Rayfield, and Milford "Pat" Patterson.
83-894.
May 10, 1985.

Contract chicken growers brought action against poultry corporation and servicemen who worked for corporation to assist growers and work with them in attempt to realize maximum profit for minimum outlay. The Circuit Court, Coffee County, Riley Green, J., dismissed servicemen on their motion, due to growers' failure to state cause of action against them. Growers appealed. The Supreme Court, Adams, J., held that benefit to growers from servicemen was not intended to be direct benefit, but rather was merely incidental benefit; thus, growers were not third-party beneficiaries of oral employment-at-willl contracts entered into between servicemen and corporation.

Affirmed.

Torbert, C.J., concurred specially and filed opinion.

West Headnotes

[1] KeyCite Notes

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of Third Person
                    95k187(1) k. In General. Most Cited Cases

One who seeks recovery as third-party beneficiary of contract must establish that contract was intended for his direct, as opposed to incidental, benefit.

[2] KeyCite Notes

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of Third Person
                    95k187(1) k. In General. Most Cited Cases

Benefit to contract chicken growers from servicemen employed by poultry corporation was not intended to be direct benefit, but rather was merely incidental benefit, where poultry corporation was interested in making as large a profit as was possible, servicemen were employed to check on growers for that reason, and broiler feeding agreement between corporation and growers provided that it represented complete understanding between parties and any variation from terms thereof must be authorized by further written agreement signed by both parties thereto; thus, growers were not third-party beneficiaries of oral employment-at-will contracts entered into between servicemen and poultry corporation.

*1227* Larry C. Jarrell of Crawley & Jarrell, Troy, for appellants.

Robert D. Segall of Copeland, Franco, Screws & Gill, Montgomery, for appellees.

ADAMS, Justice.

This is an appeal from the Coffee County Circuit Court's order dismissing the individual defendants from an action filed against them and their employer, Wayne Poultry. Plaintiffs-Lamar Mills, Willie Allen, and James and Donice Anderson-allege that the individual defendants-R.D. Welk, Randolph Johnston, W.R. Rayfield, and Milford Patterson-breached their oral employment-at-will contracts with Wayne Poultry, and as a result damaged plaintiffs' operations. We affirm.

The facts of this case are as follows:

Defendant Wayne Poultry is a foreign corporation in the business of raising and selling chickens. To this end, Wayne Poultry employs several "contract growers" who actually raise the chickens for it. Four such contract growers of Wayne Poultry were these four plaintiffs. As part of the arrangement, each of the plaintiffs would receive a flock of "broilers" from Wayne Poultry, raise them, and sell the mature chickens back to Wayne Poultry. A written broiler feeding agreement, setting out the specific terms of the agreement between the parties, was executed for each flock of broilers delivered to a grower by Wayne Poultry. In each contract there was a clause which read: "[T]his Agreement represents the complete understanding between the parties and any variation from the terms hereof must be authorized by further written agreement signed by both parties hereto." The other details, such as the number of chicks and price per pound, varied from contract to contract, but the above-mentioned clause was included in each.

As part of the overall agreement between Wayne Poultry and the contract growers, Wayne Poultry hired defendants Randolph Johnston and Milford Patterson as servicemen to assist the growers and work with them in an attempt to realize the maximum profit for the minimum outlay. Wayne Poultry also reserved the right to inspect the growers' operations at any time to ensure that they were properly performing their responsibilities.

These servicemen would maintain daily contact with the growers and make suggestions concerning any changes or improvements that should be made to comply with Wayne Poultry's standards. Their job was to aid the contract growers in their attempts to raise quality chickens at the lowest possible cost to Wayne Poultry. They were full-time employees-at-will of Wayne Poultry. Neither had written contracts with Wayne Poultry.

*1228* The other two individual defendants, W.R. Rayfield and R.D. Welk, were not servicemen. Rayfield was the head of Wayne Poultry's grow-out division. He did not come in contact with the contract growers often, but mainly supervised the servicemen to see that they carried out the directives of Wayne Poultry. Welk was a complex manager. One of his numerous responsibilities was to supervise Rayfield. Welk's contact with the contract growers was minimal. Both Rayfield and Welk were full-time employees-at-will of Wayne Poultry.

In their complaint, plaintiffs alleged that part of the overall agreement they had with Wayne Poultry was that so long as they raised quality chickens, Wayne Poultry would continue to provide them with flocks of broilers. Also, plaintiffs alleged that it was the individual defendants' job to see to it that the chickens which were raised were of good quality and acceptable to Wayne Poultry.

When Wayne Poultry stopped providing flocks of broilers to each of the plaintiffs, they filed suit in the Circuit Court of Coffee County against Wayne Poultry and the individuals they claimed were responsible for their loss of business. Plaintiffs based their action on the theory that they were third-party beneficiaries of oral employment-at-will contracts between the individual defendants and Wayne Poultry, and that the individual defendants breached their contracts with Wayne Poultry to supervise and aid the plaintiffs in the growing of chickens, thus causing Wayne Poultry to terminate them, leaving them with an investment in thousands of dollars worth of equipment which they could no longer use. Each of the plaintiffs sought $100,000.00 in damages from Wayne Poultry and

$100,000.00 in damages from the individual defendants.

On May 6, 1983, defendants filed a petition for removal to federal court based upon diversity of citizenship and the fraudulent joinder of the individual defendants. On December 1, 1983, plaintiffs' motion to remand the case to the circuit court was granted by the United States district court. The state trial court then granted the individual defendants' motion to dismiss due to the plaintiffs' failure to state a cause of action upon which relief could be granted against them. Defendant Wayne Poultry again petitioned for removal to the U.S. district court, and again the district court remanded the case, because the individual defendants were dismissed involuntarily and, therefore, plaintiffs had to appeal the dismissal to this Court before the case would be in a posture to be removed.

The single issue for our review is whether the trial court was correct when it dismissed the individual defendants from the action due to plaintiffs' failure to state a cause of action upon which relief could be granted against them. Rule 12(b)(6), A.R.Civ.P. We are of the opinion that the trial court was correct and, therefore, that its judgment is due to be affirmed.

Plaintiffs based their claim for damages on the theory that they were third-party beneficiaries of the oral employment-at-will contracts entered into between the individual defendants and Wayne Poultry. For the reasons that follow, we are of the opinion that this theory of recovery must fail.

[1] [2] First, it has long been the rule in Alabama that one who seeks recovery as a third-party beneficiary of a contract must establish that the contract was intended for his direct, as opposed to incidental, benefit. _Anderson v. Howard Hall Co., 278 Ala. 491, 179 So.2d 71 (1965)_. This position was reaffirmed in the more recent decision of _Zeigler v. Blount Brothers Construction Co., 364 So.2d 1163 (Ala.1978)_. In the case _sub judice_ we look to the pleadings, as we did in _Zeigler,_ to see that the benefit to the plaintiffs was not intended to be a direct benefit, but rather was merely an incidental benefit.

Wayne Poultry reserved the right to inspect the flocks and chicken houses at any time to ensure that it got the best results from the growers. Wayne Poultry was interested in making as large a profit as was possible, and it was for this reason that the individual defendants were employed.*1229 It is not difficult to envision a situation arising wherein the individual defendants would recommend a certain procedure or equipment change which the growers may perceive to be too great a financial outlay, but which would cause a greater yield for Wayne Poultry. It is true that because of the servicemen's advice, the growers have the possibility of receiving better compensation for raising better chickens, and in this regard any improvements or suggestions made by the servicemen could benefit the growers, but again, this is only incidental to the direct benefit which flows to Wayne Poultry.

The Court of Civil Appeals addressed the third-party beneficiary issue in _Federal Mogul Corporation v. Universal Construction Co., 376 So.2d 716 (Ala.Civ.App.)_, _cert. denied, 376 So.2d 726 (Ala.1979)_, stating:

Where, however, two contracting parties expressly provide that a third party shall have no legally enforceable rights in their agreement, a court must effectuate the expressed intent by denying the third party any direct remedy. _E.C. Ernst, Inc. v. Manhattan Construction Co. of Texas, 551 F.2d 1026 (5th Cir.1977)_, _cert. denied, Providence Hospital v. Manhattan Construction Co. of Texas, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978)_.

376 So.2d at 724. In the case before us, there is no express language to this effect in the contracts between Wayne Poultry and the individual defendants. However, an attempt to reach the same result by Wayne Poultry can be discerned from the language found in the broiler feeding agreement, which states that "this Agreement represents the complete understanding between the parties and any variation from the terms hereof must be authorized by further written agreement signed by both parties hereto." There is nothing in these broiler feeding agreements that even suggests that the contract growers have any right to enforce the oral employment-at-will contracts between Wayne Poultry and the individual defendants.

Under the allegations of the complaint, we are of the opinion that plaintiffs have failed to suggest how they were intended to receive direct, rather than incidental, benefit as a result of the employee-at-will contracts between the individual defendants and Wayne Poultry. Because they failed to do so, the trial court was correct in dismissing the individual defendants from the action. The judgment of the trial court is affirmed.

AFFIRMED.


FAULKNER, ALMON and EMBRY, JJ., concur.

TORBERT, C.J., concurs specially.


TORBERT, Chief Justice (concurring specially).
I agree that dismissal was appropriate. In reaching this conclusion, I do not rely on the existence of an integration clause in the broiler feeding agreements.

The parties to the broiler feeding agreements are Wayne Poultry and the plaintiffs. The integration clause is an expression of the understanding of those parties that that written agreement is complete and is not to be varied by parol evidence. See, *Commercial Credit Co. v. Seale,* 30 Ala.App. 440, 8 So.2d 199 (1942); 4 S. Williston, *A Treatise on the Law of Contracts* § 633 (3d ed. 1961). I do not believe that the integration clause in the agreement between Wayne Poultry and the plaintiffs in any way indicates whether the agreement between Wayne Poultry and the defendants was intended to directly benefit the plaintiffs.

Ala.,1985.
Mills v. Welk
470 So.2d 1226, 103 Lab.Cas. P 55,514

END OF DOCUMENT

 West Reporter Image (PDF)

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

248 F.Supp. 639

United States District Court D. Montana,
Helena Division.
Catherine M. OLSEN, Plaintiff,
v.
DAIRYLAND MUTUAL INSURANCE COMPANY, a corporation, Defendant.
No. 1237.
Jan. 5, 1966.

Action against insurer to recover on a judgment previously obtained by default against insured. On insurer's motion for summary judgment, the District Court, Murray, Chief Judge, held that failure of insurer to act after receiving notice that plaintiff in automobile accident case had applied for default judgment against insured did not amount to a waiver of insurer's right to attack that judgment where insurer was not a party to state court action against insured, no default was sought against it, and there was no reason for it to appear in state court.

Motion granted.

West Headnotes

[1] KeyCite Notes 

⟸48A Automobiles
    ⟸48AV Injuries from Operation, or Use of Highway
        ⟸48AV(B) Actions
            ⟸48Ak235 k. Process. Most Cited Cases
            (Formerly 48Ak235(4), 48Ak235)

Defendant in automobile accident case was not properly served with process so that court might acquire jurisdiction over him as registered mailings to him did not constitute notice of such service, where they contained only a copy of the summons and complaint and did not include notice of service upon Secretary of State, and where neither affidavits nor envelopes in which mailings were made showed that registered mail was sent requiring personal delivery, and there was no return receipt of defendant showing receipt of notice of service. R.C.M.1947, §§ 53-202 to 53-204.

[2] KeyCite Notes 

⟸31 Appearance
    ⟸31k7 Proceedings Constituting Appearance
        ⟸31k9 General or Special Appearance
            ⟸31k9(1) k. In General. Most Cited Cases

Stipulations or agreements entered into between parties or their counsel with reference to a pending suit are usually regarded as amounting to a general appearance.

[3] KeyCite Notes 

⟸31 Appearance
    ⟸31k3 k. Authority to Enter Appearance for Another. Most Cited Cases

Where individual defendant was sued for damages resulting from automobile collision, but was never served with process, conduct of insurance agency and attorney in obtaining extensions of time within which to appear as well as requesting medical reports as well as a medical examination of plaintiff, all ostensibly on behalf of defendant, did not constitute a waiver of service of process and an appearance by defendant since insurance agency was not a party to the action, and attorney specifically disclaimed authority to appear as counsel for defendant. R.C.M.1947, § 53-201 et seq.

[4] KeyCite Notes

228 Judgment
 228XVII Foreign Judgments
  228k828 Effect of Judgments of State Courts in United States Courts
   228k828.14 Persons Concluded
    228k828.14(2) k. Automobile Cases, Parties and Insurers. Most Cited Cases
    (Formerly 228k828(3.27))

Failure of insurer to act after receiving notice that plaintiff in automobile accident case had applied for default judgment against insured did not amount to a waiver of insurer's right to attack that judgment where insurer was not a party to state court action against insured, no default was sought against it, and there was no reason for it to appear in state court.

***639** Small & Cummins, Helena, Mont., for plaintiff.

Loble, Picotte, Fredricks & Smith, Helena, Mont., for defendant.

MURRAY, Chief Judge.

Plaintiff brought this action in the First Judicial District Court of the State of Montana to recover on a judgment which she had previously obtained by default in the same State Court against one Theodore H. McKinley in a personal injury action arising out of an automobile accident. She alleges that the present defendant, Dairyland Mutual Insurance Company, was the liability insurer of said McKinley at the time of the accident out of which the default judgment arose, and that under the terms of its policy of liability insurance it is liable to her on the judgment. Defendant removed ***640** the action to this court on the grounds of diversity of citizenship pursuant to the provisions of 28 U.S.C.A. § 1441 et seq.

Defendant answered, and after submitting the original judgment roll in the state court action of Catherine M. Olsen vs. Theodore H. McKinley in which the default judgment sued upon was obtained, and obtaining an admission from the plaintiff that the said judgment roll was genuine, defendant moved for summary judgment in this action, pursuant to Rule 56 of the Federal Rules of Civil Procedure, upon the ground that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law. The basis of the motion is that the judgment roll in the state court action of Olsen v. McKinley, which is before this court and conceded to be genuine, shows on its face that service of process was never obtained on the defendant McKinley, and that, therefore, the default judgment entered in that action and sued upon here is invalid and void and subject to collateral attack.

From the judgment roll in Olsen v. McKinley it is clear, and the plaintiff concedes, that no personal service of the summons and complaint was ever obtained on the defendant in that action. However, plaintiff contends that constructive service was obtained under the provisions of Chapter 2 of Title 53 (§§ 53-201 to 53-206) R.C.M. 1947, which provides that in certain circumstances, service of process in actions arising out of automobile accidents may be made upon the Secretary of State of the State of Montana. Section 53-204, R.C.M. 1947, provides how such constructive service is to be made and reads in part as follows:

'53-204. Service of process, how made- fees. Service of such summons or process under section(s) 53-202 and 53-203 shall be made by leaving a copy thereof with a fee of five dollars ($5.00) with the secretary of state of the state of Montana, or in his office, and such service shall be sufficient and valid personal service upon the defendant.

'Provided, that notice of such service and a copy of the summons or process is forthwith sent by registered mail requiring personal delivery, by the plaintiff to the defendant and the defendant's return receipt and plaintiff's affidavit of compliance herewith are appended to the process and entered as a part of the return thereof;'

Examination of the judgment roll in Olsen v. McKinley discloses that there was no compliance with the above quoted provisions of Section 53-204 in the attempt to obtain constructive service on the defendant McKinley. Included in the judgment roll are three unopened envelopes addressed to Theodore H. McKinley at Havre, Montana, and bearing the return address of plaintiff's counsel which were sent to McKinley by registered mail on October 10, 1961, December 22, 1961, and June 7, 1962, respectively, and returned to the sender in each instance unclaimed, or because of insufficient address or the addressee was unknown. In connection with each of these registered mailings, the judgment roll also contains an 'Affidavit of Mailing'. The affidavit concerned with the October 10, 1961, mailing reads as follows:

'BETTY J. DAVIS, being first duly sworn, deposes and says:

'That she is a resident of the State of Montana, over the age of 18 years, not a party to nor interested in the above entitled action;

'That on the 10th day of October, 1961, she served a true copy of the attached Summons and Complaint on Theodore H. McKinley, by depositing such copy of the said Summons and Complaint on said date in the United States Post Office at Helena, Montana, properly enclosed in a sealed envelope addressed to the said Theodore H. McKinley, Havre, Montana, by registered mail, postage thereon having been duly prepaid;

*641 'That in each of the said places there is a United States Post Office, and between said cities of Havre, Montana, and Helena, Montana, there is a regular daily communication by mail.'

The affidavits in connection with the other two mailings are identical except as to the date of mailing and that the affiant is one Robin Alley rather than Betty Davis.

[1]    It is apparent from the affidavits that these registered mailings to the defendant McKinley do not constitute the 'notice of such service (under Sections 53-202 and 53-203)' as is required by Section 53-204, because they contained only a copy of the summons and complaint, and no notice of service upon the Secretary of State, as the statute demands.

Likewise, neither the affidavits nor the envelopes in which the mailings were made show that the registered mail was sent 'requiring personal delivery' as required by the statute, and there is not otherwise any evidence in the judgment roll that this provision of the law was complied with.

Finally, there is no return receipt of the defendant showing receipt of notice of service as the statute requires. This is probably the most fatal defect of all, because, as Judge Jameson of this court pointed out in Bucholz v. Hutton, D.C., 153 F.Supp. 62, the Montana statute and similar constructive service statutes require that the defendant actually receive the notice of service and that his receipt therefor be filed. In an exhaustive annotation on this subject in 95 A.L.R.2d 1034, the annotator states at page 1039;

'Some nonresident motorist statutes in effect make the filing of the return receipt a condition of valid service on the nonresident, by declaring that service on a designated state official shall be sufficient service on the nonresident 'provided' or 'if' certain other acts are done, among them the filing of the

return receipt.' (This is the Montana statute).

'Under this type of statute, the failure to file such a receipt renders the service invalid, in the absence of extenuating circumstances.'

Further, at page 1043 of the same annotation, it is stated:

'Service of process under a nonresident motorist statute requiring the filing of the nonresident's return receipt has generally been held invalid if the nonresident did not sign a return receipt because as a result of his having moved without leaving a forwarding address the registered letter was not delivered to him.'

And at 1045, it is stated:

'According to the weight of authority, service of process under a nonresident motorist statute requiring the filing of the nonresident's return receipt is invalid if no return receipt is filed because the nonresident failed or refused to claim the registered letter sent to him pursuant to the statute.'

Therefore, under the authorities, it is clear that the attempted service of process on McKinley was invalid. As Judge Jameson pointed out in Bucholz v. Hutton, supra, 153 F.Supp. at page 65, 'Even though the statutes and proceedings should be liberally construed there must be a compliance with the plain mandates of the statute.' The judgment roll in Olsen v. McKinley demonstrate a complete failure to comply with the plain mandates of the statute.

In support of his claim that the service is valid, counsel for plaintiff relies on State ex rel. Charette v. District Court of Silver Bow County, 107 Mont. 489, 86 P.2d 750. In that case the defendant refused to accept the Notice of Service and copy of summons which were mailed to him in compliance with the statute. In refusing, in effect, to quash the service, the Montana Supreme Court held simply that the defendant could not complain of the plaintiff's failure to comply *642 with the statute when his own wilful act prevented plaintiff's literal compliance therewith. That was an entirely different situation than the present one. Here there is no showing that the plaintiff's failure to comply with the statute resulted from any wilful act of the defendant.

Plaintiff contends that the judgment in Olsen v. McKinley is not subject to collateral attack. In 30 Am.Jur. 'Judgments', Section 881, p. 794, it is stated, 'In the absence of a waiver of service, a judgment may be subject to collateral attack because of its rendition against one who was never legally served with the process of the court.' As above pointed out, the defendant McKinley was never served with process, legally or otherwise, as shown by the judgment roll. In West v. Capital Trust & Savings Bank, 113 Mont. 130, 124 P.2d 572, the Montana Supreme Court stated, at page 575:

'It is conceded here that the attack upon the foreclosure decree is collateral. The rule is well established that on such an attack there is a presumption of jurisdiction over the person of the defendant unless the contrary affirmatively appears from the judgment roll. E. J. Lander & Co. v. Brown, 110 Mont. 128, 99 P.2d 216, 217; State ex rel. Delmoe v. District Court, 100 Mont. 131, 46 P.2d 39; Coburn v. Coburn, 89 Mont. 386, 298 P. 349; Frisbee v. Coburn, 101 Mont. 58, 52 P.2d 882; Hanrahan v. Andersen, 108 Mont. 218, 90 P.2d 494; Burke v. Inter-State Savings & Loan Ass'n, 25 Mont. 315, 64 P. 879, 87 Am.St.Rep. 416.'

Certainly the contrary affirmatively appears from the judgment roll involved here.

Next, the plaintiff claims that there was a waiver of service of process. The facts and circumstances which plaintiff contends establish the waiver as shown by the affidavit for default and exhibits attached thereto contained in the judgment roll in Olsen v. McKinley may be summarized as follows:

After trying unsuccessfully to obtain personal service on the defendant McKinley, the plaintiff proceeded to attempt service by serving the Secretary of State under the provisions of Chapter 2 of Title 53, R.C.M. 1947. Having learned that Dairyland Mutual Insurance Company, the defendant in the present action, had the liability insurance on McKinley's car, counsel for the plaintiff, on February 23,

1961, directed the Secretary of States to mail a copy of the summons and complaint to Theodore H. McKinley in care of Dairyland Mutual Insurance Company at Madison, Wisconsin, and a return by the Secretary of State shows that such mailing was accomplished. At the same time counsel for plaintiff wrote directly to Dairyland Mutual Insurance Company as follows:

'Gentlemen:

'I have today delivered to the Secretary of State of the State of Montana Summons and Complaint for service in the above-entitled action which is pending in the District Court of Broadwater County at Townsend, Montana.

'We have been unable to locate the defendant, Theodore H. McKinley, for service within this state, and are informed that he has left the state. Therefore, we are delivering this for service, pursuant to our laws which permit service upon a defendant in a motor vehicle case, such as this, by the Secretary of State when he cannot be found within the state, or has gone from the state.

'I have also requested the Secretary of State to serve a copy of such Summons and Complaint upon your company, for the reason that we are informed that your company carried liability insurance upon the automobile of the defendant, McKinley, that was involved in this accident. For that reason, I presume that it will be of interest to you; and that you may want to make some *643 appearance for the defendant, rather than to permit a default in the action if the defendant does not personally appear therein.

'If you desire further information in connection with this incident, I will be glad to furnish the same if I can possibly do so.'

Apparently, as a result of this letter, counsel for plaintiff received a telephone communication from Valley General Agency of Kalispell, Montana, an insurance adjusting agency, informing him that the matter of Olsen v. McKinley had been referred to that agency by Dairyland Mutual for handling and requesting an extension of time within which to appear and holding out the hope that a settlement might be negotiated. Thereafter, and commencing on March 24, 1961, there followed a series of letters between Valley General Agency and counsel for plaintiff discussing the possibility of settlement of the case, which culminated in a request by counsel for the plaintiff that the matter be turned over by Valley General Agency to an attorney so that an appearance might be made and the case brought to issue so that it might be tried in the event a settlement could not be achieved.

Thereafter, and on June 13, 1961, counsel for plaintiff received a letter from a Kalispell attorney informing him that the matter had been turned over to the Kalispell attorney by Valley General Agency and requesting copies of medical reports. Correspondence between plaintiff's counsel and the Kalispell attorney concerning obtaining medical reports and a medical examination of the plaintiff on behalf of the defendant continued and the Kalispell attorney did arrange for and obtain a physical examination of the plaintiff on behalf of defendant. This correspondence between the plaintiff's counsel and the Kalispell attorney terminated when plaintiff's counsel requested that the Kalispell attorney enter an appearance on behalf of the defendant so the case could be brought to issue for trial in the event a settlement could not be negotiated. In reply, on October 2, 1961, the Kalispell attorney wrote plaintiff's counsel inquiring as to whether service of process on the defendant had ever been obtained, and informing him that if service had not been obtained, he, the Kalispell attorney had no authority to appear in the case on behalf of the defendant as he had never been authorized to represent the defendant. Shortly thereafter, and on October 18, 1961, counsel for plaintiff filed his affidavit for default and proceeded to obtain the default judgment involved in the present action.

Counsel for plaintiff contends that the conduct of Valley General Agency and the Kalispell attorney, in obtaining extensions of time within which to appear and in requesting medical reports and in going so far as to obtain a medical examination of the plaintiff, all ostensibly on behalf of the defendant McKinley, constituted a waiver of service of process and an appearance in the action. This contention must fail for several reasons.



[2] [3]    First, the rule relied upon by plaintiff is stated as follows in 6 C.J.S. Appearances § 12i, p. 33:

'Stipulations or agreements entered into between the parties or their counsel with reference to a pending suit are usually regarded as amounting to a general appearance.'

The emphasized words in the statement of the rule demonstrate its inapplicability to the situation here. It must be kept in mind that the action was against Theodore H. McKinley and the default judgment was taken against him. Neither Dairyland Mutual Insurance Company nor the Valley General Agency was a party to the action and there is no showing in the record that they had any authority to waive on behalf of McKinley his right to service of process and enter an appearance in his behalf in an action wherein he had never been subjected to the jurisdiction of the court by service of process. Likewise, there is no showing that the Kalispell attorney was ever authorized to appear in the action **644** as counsel for McKinley, and he specifically disclaimed such authority. No case has been cited and the court has found none holding that a liability insurance carrier has authority on behalf of its insured to waive his right to the service of process in an action brought against him. The policy involved in this case is not before the court. In the usual automobile policy, the insurer reserves the right and has the obligation to defend on behalf of the insured any action brought against him that is covered by the policy. However, it is inconceivable that this right to defend an action carries with it the right to waive on behalf of the insured his right to be served with process in the action, because in many instances the potential liability of the insured in the action greatly exceeds the coverage of the insurance policy, and the effect of permitting the insurer to waive, without the insured's consent, his right to be served with process would be to subject the insured to such excess liability without due process of law. In all of the cases cited by the plaintiff which hold that a judgment against an insured is binding on the insurer, there had been proper service of process on the insured.

In the second place, even if some authority could be found for Dairyland Mutual through Valley General Agency and the Kalispell attorney to waive McKinley's right to service of process and make an appearance in the action in his behalf, and even if the procuring of extensions of time and physical examination of the plaintiff constituted such waiver and appearance, the plaintiff would be in no position to rely on the waiver and appearance, because the extensions of time and the physical examination of plaintiff were obtained by Dairyland Mutual through Valley General Agency and the Kalispell attorney under the mistaken belief, induced by plaintiff's counsel, that proper service had been had on the defendant McKinley. Thus, in his first letter to Dairyland Mutual, quoted above plaintiff's attorney stated in effect that proper service had been had on the defendant McKinley. Likewise, in his first letter to the Kalispell attorney, plaintiff's counsel stated in part:

'Thank you for your letter of June 13 in regard to the abovenamed action that is now pending in the District Court of Broadwater County. Some time ago, and after we had served the defendant McKinley, I was contacted by the Valley General Agency,' etc.

This is not to say that plaintiff's counsel deliberately or wilfully attmpted to deceive either Dairyland Mutual or the Kalispell attorney, because he apparently did and still does believe that he had made proper service on McKinley. However, having induced a course of conduct by furnishing incorrect information, however innocently, the plaintiff could not claim an advantage as a result of that course of conduct.

[4]    Lastly, plaintiff contends that because Dairyland Mutual, the present defendant, had notice of the application for default judgment against McKinley, that it waived its right to attack that judgment herein, by not appearing in the state court and either moving to quash service or moving to set aside the default. The answer to this contention is that it was not a party to the state court action, no default was sought against it and there was no reason for it to appear in the state court.

For the foregoing reasons, IT IS ORDERED and this does order that the defendant's motion for summary judgment be and the same hereby is granted on the ground that there is no genuine issue

as to any material fact, and the defendant is entitled to judgment as a matter of law and to its costs. The Clerk of this court is directed to enter judgment for defendant.

D.C.Mont. 1966.
Olsen v. Dairyland Mut. Ins. Co.,
248 F.Supp. 639

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.